16 Ill. App.3d 812 (1974)
306 N.E.2d 906
KEITH D. SCHNULLE et al., Plaintiffs-Appellees,
v.
THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF ELGIN et al., Defendants-Appellants.
No. 72-274.
Illinois Appellate Court  Second District.
January 28, 1974.
Robert B. Kramer, of Elgin, for appellants.
Carbary, Carbary & Chapski, of Elgin, for appellees.
Judgment reversed, cause remanded.
*813 Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:
Plaintiffs, patrolmen with the City of Elgin police department, were charged with the violation of various department rules. Upon a finding of guilt, the Board of Fire and Police Commissioners (Board) discharged Officer Schnulle and suspended Officers Panzloff and Shimp for 30 and 15 days respectively. A complaint, filed under the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, sec. 264 et seq.), sought reversal of the Board's orders and set forth 33 assignments of error. After considering seven of the points raised, the trial court found no error as to six but reversed the orders as being contrary to the manifest weight of the evidence and stated that because of its finding it was unnecessary to reach a determination on the remaining specified errors. The sole issue raised on appeal is whether the Board's orders were contrary to the manifest weight of the evidence.
The charges against Schnulle were that he unnecessarily kicked and struck Donald Underhill who was under arrest; used coarse, obscene, abusive and profane language to Underhill; denied in writing having struck any blows during the incident in question thereby making a false official statement; conducted himself in a manner unbecoming a police officer and, by his actions, was a detriment to the service. Panzloff and Shimp, present at the time of the incident, were each charged with failing to report Schnulle's actions to the proper supervising officer and with making false official statements during the investigation of the incident, denying that they saw any blows struck by an officer or by Underhill.
On June 15, 1971, Officer Schnulle saw Underhill, whom he knew to be on parole, driving a motorcycle. He followed and when Underhill pulled into an automart lot, Schnulle called to him, asked for his driver's license and was shown a temporary permit. There are discrepancies in testimony relating to occurrences during this time. Underhill claimed there was an altercation between himself and Schnulle; Schnulle stated that Underhill used foul and abusive language but that he did not respond. For purposes here, and relative to the taking into custody, we note only that Schnulle ascertained Underhill's driver's license had been revoked, a detention vehicle was called for, Underhill was searched and Schnulle took hold of his arm telling him he would have to go to the station.
Testimony is significantly disparate regarding events subsequent to arrival at the police station garage.
Underhill testified that Officer Panzloff (who had been in the cab of the detention vehicle with Officer Shimp) took him from the vehicle *814 and told him to keep his mouth shut for his own good; that while he walked with Schnulle from the vehicle toward the elevator, Schnulle told him to "say something now you smart __________ ____________" and that he responded by telling Schnulle he was not supposed to talk like that; that before entering the elevator, Schnulle, wearing a pair of black leather gloves, without provocation, hit him on the left side of the head, stunning him. (On cross-examination, Underhill stated that he did not know whether the gloves were weighted.) Underhill was next cognizant of being in the elevator where Schnulle continued to hit him in the face and, tiring, grabbed him by the hair. He ducked and Schnulle kicked him several times in the head and once in the leg, side and back; when he turned away, Schnulle grabbed him by the head and hair, "rabbit punching" him on the back of the neck. He claimed that during these actions, Schnulle said nothing and that two other officers (Panzloff and Shimp) were in the elevator positioned on the far side of Schnulle. When the elevator doors opened at the basement level, Schnulle hit him a few more times and dragged him into the hallway. Underhill was then taken to a room off of the hallway; a sergeant came in and was present when Schnulle told Underhill that he would "make ___________ mincemeat out of [him] or something like that." Underhill was booked, charged with disorderly conduct and driving with a revoked license, and remained at the station until 5:30 or 6:00 P.M. when his mother posted bail. He asserted that during his detention he did not complain to any officers about his treatment for fear of again being beaten and he attested to the fact that the marks and bruises on his face, head and body were neither self-inflicted nor the result of any prior occurrence.
In accounting for the same events, Schnulle testified that he arrived at the police station garage in his squadrol, that as Underhill emerged from the detention vehicle he was swearing at the officers, and Panzloff told him to be quiet and everything would be fine. Schnulle and Underhill walked toward the elevator, Shimp and Panzloff behind. The latter two returned to their vehicle for articles and, during their absence, Underhill directed another obscenity at Schnulle and raised his left hand. Anticipating a blow, Schnulle pushed Underhill away and into the wall of the narrow hallway in which they were walking. As the elevator door opened, Schnulle grabbed Underhill by the seat of the pants and the scruff of the neck and pushed him into the elevator. Underhill did not resist. Panzloff and Shimp entered the elevator and stood along the right-hand wall, Underhill along the left, Schnulle in the middle. During the elevator's descent (which he later timed at 15 seconds), Schnulle responded to Underhill's continued swearing by telling him to "shut his damn mouth", (the only profanity he claims to have used), grabbed him *815 and held him by the hair on the back of his head. The elevator, equipped with an emergency stop switch which automatically rings a signal bell, did not stop during the descent; the bell never rang. Schnulle stated that Panzloff and Shimp said nothing in the elevator, neither did they have occasion to intercede between himself and Underhill. Upon reaching the basement, they proceeded to the booking room and while Panzloff and Shimp waited at the doorway, a Sergeant Kehm asked Underhill the cause of the arrest and conversed with him briefly about drivers' licenses and California. Underhill was then placed in a cell until his mother arrived to post bond at which time Schnulle was called to the front desk and, as the mother was about to say something to him, Underhill told her to "just leave him alone; he's a good cop, just doing his job". Schnulle stated that he had not included Underhill's profanity or behavior in his report because it was routine for persons under arrest to swear at the officer and to offer some slight resistance. He admitted owning a pair of weighted riot gloves but stated that they were in his squad car and that he had not worn them that day.
Officer Panzloff testified that when he opened the door of the detention vehicle for Underhill, the latter emerged calmly and walked toward Schnulle; that while he and Shimp went to the front of their vehicle, he could hear Underhill swearing; that he did not see Schnulle grab Underhill by the seat of the pants and the scruff of the neck; that during the time in the elevator Schnulle held Underhill by the back of the neck or the T-shirt area and told Underhill that "every time I see you out on the street you give me some __________." During the descent, Panzloff stated, he talked to Shimp and there was conversation between Schnulle and Underhill, the latter continuing to use profanities, no kicks or blows were struck and none of the officers wore black gloves. At the booking room, Panzloff recalled only that Sergeant Kehm asked Underhill "Why don't you go back to California?" and Underhill responded that he had been trying to do that. Panzloff testified that as Schnulle's senior officer, he would have reported him had he been disorderly, but that there had been no unusual incident to report.
Officer Shimp's testimony was essentially the same as Panzloff's except that he remembered no conversation during the elevator ride other than that between Panzloff and himself and that while Schnulle might have sworn, he doubted it but was paying little attention.
Sergeant Kehm, who had initially ordered Schnulle to bring Underhill in, stated that he entered the booking room at approximately 5:00 P.M., a minute or two after Schnulle and Underhill; Panzloff and Shimp were in the vicinity. Kehm sat on the edge of the desk, asked what was going on and Underhill told him that he had lost his head. Both Schnulle *816 and Underhill appeared irritated. Kehm suggested to Underhill that he go back to California. There was no other significant conversation and he never heard anything like the "mincemeat" statement allegedly made by Schnulle. He noticed no bruises, red marks, skin abrasions or bleeding on Underhill; the subject did not complain of having been abused. The sergeant also testified that there are three TV cameras in the building with monitors in the radio room; that there is a camera in the garage, none in the elevator (although there is a microphone there); that the radio operator made no comment on any disturbance of any sort during the time Underhill came in but that no one pays too much attention to the TV monitors.
Schnulle, Panzloff, the booking sergeant and the back-up officer at the arrest (who also saw Underhill later at the station) testified that Underhill was dirty, covered with grease and/or oil, and that while they were each in close proximity to the subject, no bruises were apparent at the time of the arrest or in the booking room. Three of these testified that Underhill wore a bandana tied around his forehead. Still another officer who came into the booking room during Underhill's presence, stated that he saw nothing unusual, did not see the sergeant and saw no marks or bruises on Underhill.
A lieutenant testified to the good record of each of the three officers.
Several witnesses testified concerning marks and bruises on Underhill's body. His mother stated that when she arrived at the scene of the arrest in response to her son's call, she observed nothing unusual about his face or head but just after leaving the police station that evening, she saw that his right eye was swollen, his left eye was black and blue on the lid and he had a scrape in the center of his forehead near the hair line. After speaking to her son about the injuries, they, in company with the stepfather, drove to their committeeman's house and then to the home of a city councilman, at both places showing the injuries and relating the earlier occurrences. At the councilman's recommendation, the three returned to the police station to file a complaint but were told to come back the next morning. The mother stated that she observed several bruises on her son's back, one of which was very red and scraped, that his neck and shoulder area was very red, that on the following day she observed a bruise on his thigh and one in the groin area and that on the evening of the 15th she applied cold packs to her son's neck prior to their driving to the emergency room at the hospital.
The committeeman, who had previously known Underhill, testified that at approximately 6:00 P.M. on June 15th, he had occasion to observe that Underhill's right eye was black, the skin around his eye skinned, the top center of his forehead bruised and that at the base of *817 his neck between the shoulders, there was a bruise which appeared similar to a "floor burn."
The councilman, who had not previously known Underhill, stated that at about 6:15 P.M. that same evening, from a distance of one and one-half feet, he observed "yellowish" bruises under Underhill's right eye, along that temple, his forehead and neck.
A neighbor of Underhill's testified that he talked with Underhill and his mother at approximately 7:30 P.M. that same evening; that from a distance of four to five feet he observed a dent along Underhill's left eyebrow and eyelid and a red-scuffed-type of bruise on his left cheekbone; that Underhill raised his T-shirt to show other bruises and about 15 minutes later, at his mother's suggestion, did so again for the benefit of the neighbor's wife. Three to five marks were noted along the curve of his left ribs and eight to twelve marks of varying size and shape on his back. one being very dark colored and half-moon shaped, the others dark brown, bluish-brown or yellow. During the 15 minutes since first viewing these bruises, the neighbor contended that they had grown visibly more pronounced.
The doctor who examined Underhill at the emergency room of the hospital, testified that he had an independent recollection of the examination, that Underhill told him he had been beaten by a few policemen and that, examining only those parts of the body about which Underhill complained, he observed multiple bruises on Underhill's neck, some blue and some yellow-green. He said that discolorations of a blue or green cast indicate that the injuries are not acute and probably occurred a day or two before, although a discoloration bruise can develop in a few hours or less. The doctor did not recall any bruises on Underhill's head or around either of his eyes nor abrasions around the temple; his report indicated that Underhill had complained of headache, pain in the neck, some discomfort in the shoulders, dizziness when bending over and severe vomiting. X-rays were taken but there were no objective findings.
The owner of the automart at which Underhill was arrested knew him as a past employee, was appoximately five feet from him just prior to his arrest, did not notice if Underhill wore a headband at that time, thought he seemed clean and without bruises but seeing Underhill a day or two after the arrest, he noticed a few bruises.
On the morning of June 16th, Underhill returned to the police station, made a statement and signed a complaint. The police took two black-and-white, front-view facial photographs of Underhill which indicated a darkened area on and immediately above the left eyelid, visible only when that eyebrow was raised, and a small lump and abrasion in the *818 center of Underhill's forehead just below the hairline. Other than a possible puffiness of Underhill's right cheek, no other marks or bruises are apparent.
 1-3 The findings and conclusions of the Board on questions of fact are prima facie true and correct (Ill. Rev. Stat. 1971, ch. 110, sec. 274). On review it is not the duty of the court to weigh the evidence but rather it is its duty to ascertain if the findings and decision of the administrative agency are against the manifest weight of the evidence. To so find, it is necessary that an opposite conclusion be clearly evident (Bock v. Long, 3 Ill. App.3d 691, 693 (1972)) and where there is any evidence which fairly tends to support the Board's decision, it should not be reversed (Davenport v. Board of Fire & Police Comm'rs, 2 Ill. App.3d 864, 868 (1972)). It is particularly within the province of the administrative agency to resolve any conflict presented by the evidence and to determine the credibility of the witnesses, Peterson v. Board of Trustees, 54 Ill.2d 260, 262-263 (1973).
In the instant case there was conflicting testimony surrounding the events which took place. The Board was obliged to resolve that conflict. In so doing, it was necessary that they consider the credibility of the witnesses together with the fact that Underhill's version of the events was corroborated by five disinterested witnesses, his mother and the photographs of his injuries.
A review of the record does not make a conclusion opposite to the Board's, clearly evident. The total evidence fairly tends to support the Board's decision which is, therefore, not against the manifest weight of the evidence.
Accordingly, the judgment of the circuit court is reversed and this cause remanded with directions for the court to consider the remainder of those specifications of error as yet undecided.
Judgment reversed; cause remanded with directions.
GUILD, P.J., and SEIDENFELD, J., concur.