CHARLES MOBLEY, Plaintiff-Appellant, v. JAMES CONLISK, JR., et al., Defendants-Appellees.

First District (1st Division)   No. 76-104

Opinion filed May 1, 1978.

John C. Ambrose and Philip J. Schmidt, both of Chicago, for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale, Edmund Hatfield, and Henry Phillip Gruss, Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

The plaintiff, Charles Mobley, was discharged from his position as police officer of the City of Chicago following a hearing before defendant Police Board. Plaintiff sought review in the circuit court of Cook County pursuant to the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*) and the court affirmed the decision of the Police Board. Plaintiff has appealed and argues that the findings and decision of the Police Board are against the manifest weight of the evidence.

The charges brought against plaintiff arose from two incidents which

occurred on the evenings of March 9, 10 and 11, 1970. The evidence produced at the hearing concerning the March 9 occurrence consisted of the testimony of Clemon Kimble, Charlie Alexander and Andrew Brown, who testified that plaintiff and his partner Carter stopped and searched them and accepted a $20 bribe from Kimble in return for not placing them under arrest. Plaintiff and his partner testified that they did stop and search the three men but found no contraband and accepted no money from them.

Kimble testified that on the night in question he was in a car with Alexander and Brown parked in front of a restaurant at 21st Street and Pulaski in the city of Chicago. Plaintiff and Carter drove toward them in an unmarked police car, made a "U" turn and pulled alongside their car. The policemen told them to get out and put their hands on their car. Plaintiff searched the witness and found dice in his pocket. The witness saw plaintiff search Brown and find dice in his pocket also. Carter searched the car and found a pocket knife and a tool for cleaning a printing press. The witness testified that plaintiff told him he could go to jail for having dice and that he would let him save his money to pay for his bond. The policemen told the three to get into the police car and they did. Carter then drove around the block. Kimble said he would give them $5 and Mobley said "five wouldn't do, at least ten apiece." Kimble then gave $20 to plaintiff Mobley over the front seat, and the three were released near their car. Alexander noted the police car's license number and, when the three men went home, Alexander called the police and the witness spoke over the phone. On cross-examination, the witness first said he could not remember the denominations of the bills, but then stated he gave plaintiff two $10 bills. The witness had $50 in his pocket when he was searched, but it was not taken when he was searched. The knife was not a switchblade; it was a small pocket knife. Neither Carter nor plaintiff stated they wanted money, but the witness repeated that he had offered $5 and plaintiff said "five wouldn't do, he said ten apiece."

Alexander testified that it was his car that all three men were sitting in. He repeated the way they were stopped and searched and were told to get into the police car. The witness said that nothing was found on his person during the search, but he saw that dice were discovered in the pockets of Kimble and Brown. In the police car, plaintiff said, "Don't you know you could be pulled in for them knives on the bottom of the seat and the dice?" and, "Do you all have any money?" Kimble said they had about $30 or $40, and "gave the money." The witness testified that plaintiff searched his car and discovered the knife, which was a pocket knife two inches long when folded, and the tool, which the witness described as a wood-handled blunt blade about 1½ inches long, which he used at work. After the two policemen told them to get out, Alexander took down the

license number. On cross-examination, the witness testified that Carter had the dice and that he didn't know which officer had the knife, but then he said that Carter had the knife.

Brown corroborated Kimble and Alexander on the facts of the stop by plaintiff and Carter, the searches of the men and the car, the finding of dice in the pocket of the witness and Kimble, and the finding of two knives inside the car. The witness testified that while the three men were in the back seat of the police car, plaintiff "asked how much money we have. We said 'five dollars.' He said that weren't enough." The witness saw Kimble take $20 out of his pocket and put it into plaintiff's hand. On cross-examination, Brown stated that while he was sitting in the back seat of Alexander's car, he did turn around when the police car went by, but he did not duck down.

Plaintiff testified that a few days before that night the restaurant in front of which Alexander's car was parked had been robbed. While on patrol with his partner Carter, he observed the car parked two doors from the restaurant, with three men seated inside. The headlights were turned off. When the people in the car saw the police car, they "bent over in a position like they were putting something under the seat," in a "suspicious manner." The officers made a "U" turn and double parked next to the car and exited. Neither officer had his gun drawn. Plaintiff saw a "linoleum knife" on the floor of the car and searched Kimble and Brown. Plaintiff testified that he did not confiscate anything, although he found dice in the pockets of Kimble and Brown, which he returned. He denied saying it was illegal to carry dice or that he was going to arrest the three men. Kimble protested to him that "we wouldn't be doing this if it were a white neighborhood, and that we were merely picking on them." Plaintiff searched the car, not his partner Carter; all he found was the linoleum knife. There was no other knife or contraband discovered. Plaintiff testified that he questioned and searched the three men because of the recent robbery at the restaurant and because their actions had been suspicious. He denied soliciting money and denied that he had received any money in his hand or on the front seat.

Alphonso Carter, who had also been charged with the violations of the department rules, then testified that he was plaintiff's partner on patrol that night. He was driving the car when he saw the three men in the parked car make suspicious moves, "as though they were trying to elude us as we passed by." He was aware of a prior robbery at the restaurant. His search of the men revealed no weapons or other contraband, nor did he see plaintiff discover anything illicit from his search of the car. He observed no violations of any law or ordinance. He drove the police car that night. Everybody got into the police car because it was cold and he drove around the block because the car had been blocking traffic. He saw

no money transferred, but he did see Kimble hand his identification over the seat to plaintiff. He did not solicit or accept any money from the three men and he did not violate any other department rules.

The evidence produced at the hearing concerning the March 10 and 11 incident consisted of the testimony of two men, James Webster and James Williams, who had been investigated by plaintiff and his partner on the night of March 10, and who, according to Williams, paid plaintiff $20 on March 11 for not arresting them. Several Chicago police officers testified and corroborated much of Williams's account of the March 11 transfer of money. Plaintiff and Carter denied solicitation of funds.

James Williams testified that on March 10 he was working as a security guard with James Webster at a supermarket near Pulaski and 31st Street in Chicago. They had just left work in Webster's car when they were stopped by a marked squad car with two uniformed policemen in it at about 9:15 p.m. Webster exited his car and entered the police car parked behind it, while the witness remained seated in Webster's car. An unmarked police car arrived and parked behind the squad car. One of the uniformed policemen came up to the witness, shined a light at him and said to wait a few minutes, then returned to the police car. The witness then testified that plaintiff, in plain clothes, walked up to the car and looked in the window. Williams said, "Do you want me?" Plaintiff replied, "Yes, stretch your legs a while." Williams and plaintiff then got into the back seat of the marked squad car with Webster.

Williams testified that one of the uniformed officers then asked how much money they had, and Williams replied that he had none, but that if they would stop the next day, "I will give you some money." The other uniformed policeman asked how much money, to which Williams responded, "I will make it worth your while." The first uniformed officer then said, "I am going to let you go. I will send for the money. If you don't pay me, don't give it to me, I will get you." Plaintiff then said, "I will pick it up." One of the uniformed officers told him it was against the law to have a gun, and the witness replied that the gun was registered. Plaintiff then said, "Well now, you know you are wrong. You better get this money right. And if I come in there [the supermarket] will you give me some steaks?" The witness replied that all he would get was money. The witness testified that the policemen all said they would leave the amount to him. Williams then asked what time would they arrive, and plaintiff told him 6:15; Williams then said to get there before 7:15 or there would be no payment. Williams was released without being arrested. He called his supervisor at the security guard agency that night.

On the next day, March 11, Williams met with Sergeant Major of the Chicago Police Department, in the supermarket at about 4 p.m. The officer gave him two $10 bills and the witness signed a receipt on which

the serial numbers of the bills had been recorded. At 7 p.m., plaintiff and Carter arrived at the store and Williams met them at the door and led them toward a bread display. The witness testified that as plaintiff looked around, he said, "This is a fine store. You sell whiskey here?" Williams replied, "Hurry, man, get your money and get out of here." Williams then offered $20 to Carter, who said, "I don't want the money, give it to him," indicating plaintiff. Williams then put the money in plaintiff's pocket and gave a signal. The police officers present then stopped plaintiff and Carter and Williams told them which of plaintiff's pockets the money was in.

On cross-examination, Williams stated that he did not commit a crime on the night of the 10th. Although he had a weapon concealed on his person, he told no police officer he was armed. He admitted he was not asked for $20 and that nobody ever told him he was under arrest. Williams recalled that plaintiff had asked him in the police car if he knew a certain lieutenant of police who also worked for the security guard agency, and Williams did know the man. When plaintiff and Carter entered the store on the 11th, Williams was the first person to speak and said he would "make it worth their while." Williams admitted that he offered the bribe and that neither plaintiff nor Carter said, "We are here to get the money." Plaintiff had asked in the police car how much money would Williams give, but Williams had refused to be specific. Plaintiff did not actually ask for whiskey.

James Webster testified that he was the driver of the car in which Williams was riding on the evening of the 10th. He was stopped by a marked squad car for driving with his bright lights on. He got out of the car and went back to the squad car and, as he reached for his license, the uniformed policeman saw his gun and told him it was illegal to carry one. Webster explained that he was a security guard, that the gun was registered and that he was transporting it home after work. The uniformed policemen called for another car and an unmarked car arrived carrying two plainclothed policemen. Webster was in the back seat of the marked car and plaintiff entered and sat next to him. Webster admitted to plaintiff that he had a gun and plaintiff said he could put him in jail for possessing one. Plaintiff then exited the car, went to the witness's car, where Williams was sitting, and returned. Plaintiff then asked Webster if he had any money, and Webster said, "No." That was all plaintiff said. One of the uniformed officers then told him to go home. He did not consider himself under arrest and never saw the police involved anymore. Nobody searched him and plaintiff himself did not see the gun. On cross-examination, Webster stated that Mobley never asked for money in exchange for letting him go. In response to questions put by the hearing officer, Webster stated that he did not recall Williams being in the car with plaintiff and himself at all. Mobley didn't ask for money, he asked if he

had any money and the witness thought he was kidding. He never heard any police officer ask for money and he heard no arrangements made to meet Williams the next night at or before 7:15. He was 76 years old at the hearing.

Several police officers, including Sergeant Major, testified that they were on surveillance at the store from about 4 p.m. until plaintiff and his partner arrived at about 7. They all observed plaintiff and his partner arrive and meet Williams. After Williams gave the prearranged signal, they stopped plaintiff and his partner and the marked money was produced by plaintiff from his pocket, the same pocket Williams told them the money was in. However, none of the officers heard the conversation between Williams and plaintiff and Carter, and none actually saw how the bills were passed to plaintiff.

The two uniformed policemen who had stopped Williams and Webster initially, and who were also charged with violations of departmental rules because of the incident, testified that they had called for a tactical car when Webster's gun was discovered because tactical officers have more expertise in gun cases, and they were uncertain whether the two men had a right to transport the weapons because they were security guards. Plaintiff and Carter responded to their call. They each denied that money was ever discussed in their presence by plaintiff and they denied that any appointment had been made on their behalf to pick up a payoff.

Carter, who was also under charges at the hearing, then testified that on the night of March 10 he and plaintiff responded to the call of the uniformed policemen for a tactical unit. Carter stayed in the unmarked car during the whole incident and neither saw nor heard anything that transpired between plaintiff and the others present. On March 11 he and plaintiff were patrolling and making "premises checks" in the neighborhood of the supermarket and they entered to check the store and to verify that Williams and Webster worked there. Williams was in the store and gestured for them to approach him and they did. Williams said, "I got something for you," and Carter was surprised. Williams then pulled an address book out of his pocket and extracted money. Carter said, "I don't want any money," and turned away and walked to the checkout counter, where he purchased a package of gum. As he turned to walk out, he was stopped by police officers and told to empty his pockets, which he did. He denied he had violated any departmental rules on either night. He believed that the law exempted security guards transporting concealed weapons to and from work from violation of the unlawful use of weapons statute. He had made premises checks of that supermarket before. On cross-examination, he testified that he and plaintiff decided to verify the guards' employment at the store on the spur of the moment, and they had not discussed or planned to do so in advance.

Plaintiff testified that on March 10 he was in a tactical car with Carter when they answered a radio call to assist officers who had made a traffic stop and found that one or two of the occupants of the car had guns. Carter stayed in their car, and plaintiff entered the back of the squad car with Webster, who told plaintiff he was a security guard and that he was on his way home. Plaintiff then spoke to Williams and asked if he knew a lieutenant and a captain who also worked for the security guard firm and Williams said that he did. Plaintiff testified that he did not see any weapon, but was told that the two men had weapons. Plaintiff denied ever conversing about money, asking for money, asking for steaks, or asking for whiskey. Based on the information he had received, he did not arrest Williams or Webster because he did not feel at the time that any violation had been committed. He noted that both men were elderly and did not appear to be the type of people he would stop and frisk.

The next night he and his partner made several premises checks in the area and stopped at the supermarket to verify that the two men actually worked there. He went in, saw Williams, who gestured for the officer to approach him, and walked up to Williams. Williams took an address book from his pocket and said, "I want to give you something," removing money from the book. Plaintiff said, "I don't see or feel that I have done anything for you to give us anything." Williams then took the money and stuck it in plaintiff's pocket. Plaintiff objected, Williams turned and walked away, and plaintiff called and walked behind him. Plaintiff was then stopped by the sergeant from the Internal Investigation Division (I.I.D.). No one was close enough to him to hear his protest to Williams. He was led to the front of the store, where other police officers were waiting, and Williams told the others, "It is in the right hand coat pocket." So he reached into the pocket and pulled the money out. He denied violating any departmental rules.

On cross-examination, plaintiff testified that he had made premises checks of that store several times before. He admitted that he had not taken down Williams's and Webster's names, addresses, phone numbers or license number on March 10. On examination by the hearing officer, plaintiff stated that after the money was placed in his pocket he was immediately stopped by the I.I.D. and he had no time to explain to the I.I.D. officers or offer to give the money up before the money was asked for. He believed Williams resented being stopped for the traffic violation and having a light shined in his face as he sat in the car.

The Police Board found that plaintiff had been proved to have violated departmental rules and regulations. As to the March 9 incident, the Board found that plaintiff had violated Rule 4, "Any conduct or action taken to use the official position for personal gain or influence," by using his power

and authority to arrest to coerce Kimble into giving him $20; Rule 37, "Failure to inventory and process recovered property in conformance with Department orders," by failing to confiscate and inventory the dice, knife and cutting tool; and Rule 45, "Soliciting or accepting any gratuity, or soliciting or accepting a gift, present, reward, or other thing of value for any service rendered as a department member, * * * or as a condition for not performing sworn duties," by accepting the money as stated above. As to the March 10 and 11 incident, the Board found that plaintiff violated Rule 4, by obtaining $20 from Williams; Rule 45, for the same conduct; and Rule 5, "Failure to perform a duty," by not arresting Williams and Webster and confiscating and inventorying the guns although aware that Williams and Webster were in violation of the law. The Board then ordered plaintiff be separated from the department as a result of its findings.

■■ On review of the findings and decision of an administrative agency, the question is whether they are against the manifest weight of the evidence. (*Schnulle v. Board of Fire & Police Commissioners* (1974), 16 Ill. App. 3d 812, 306 N.E.2d 906.) Resolution of conflicting evidence is the duty of the administrative agency, as is the determination of credibility of the witnesses heard by the agency (*Peterson v. Board of Trustees* (1973), 54 Ill. 2d 260, 296 N.E.2d 721; *Moore v. Chicago Police Board* (1976), 42 Ill. App. 3d 343, 355 N.E.2d 745), and the court may not substitute its judgment unless an opposite conclusion is clearly evident. *Kelly v. Police Board* (1975), 25 Ill. App. 3d 559, 323 N.E.2d 624.

■■ As to the March 9 incident involving Kimble, Alexander and Brown, those three men testified that plaintiff took money from Kimble after threatening to arrest them. Plaintiff and his partner testified and denied that any money was asked for or received. This conflict was resolved by the Board against plaintiff and we do not find any support in the record for plaintiff's argument that this determination is against the manifest weight of the evidence. Plaintiff argues that there are so many contradictions in the testimony of Kimble, Brown and Alexander that it is "incredible" that the Board found the violations of the rules, specifically pointing to variations in their testimony as to who searched each of the three men, who searched the car, who drove the police car and who took the knives. These are minor inconsistencies and it cannot be denied that all three were consistent on the controlling facts, which were that plaintiff threatened to arrest them and, after receiving twenty dollars from Kimble, released them. While plaintiff's denials and explanation of the stop, corroborated by his partner, are plausible, we will not substitute our judgment for that of the administrative agency. Plaintiff argues that Carter must be believed because he was not found in violation of the

rules, though he was charged with the same violations as plaintiff. The disposition of the charges against Carter is not part of the record before us and we may not consider this assertion. (Ill. Rev. Stat. 1971, ch. 110, par. 274; *Sola v. Clifford* (1975), 29 Ill. App. 3d 233, 329 N.E.2d 869.) Furthermore, the evidence against Carter was different, in that all three of the men agreed that Mobley accepted the money.

■■ However, we do agree with plaintiff's assertion that the violation of Rule 37 was not supported by the evidence. The dice, pocket knife and tool discovered by plaintiff were not evidence of any offense and we can see no reason why they should have been inventoried. Defendants offer no argument or citation to authority to support the finding of the Board on this issue and we conclude that it is against the manifest weight of the evidence. *Kerr v. Police Board* (1974), 59 Ill. 2d 140, 319 N.E.2d 478.

■■ Plaintiff argues in regard to the March 10 and 11 incident that the only evidence in support of the violation of Rules 4 and 45 is "the uncorroborated testimony of an irate security guard." We disagree. In addition to Williams's testimony, the Board heard the testimony of Webster, who admitted carrying a concealed weapon and who positively identified plaintiff as the plainclothes policeman who asked him if he had any money; the testimony of the surveillance officers who saw plaintiff arrive at the supermarket at the prearranged time and who saw plaintiff produce the money from his pocket; and the testimony of the uniformed officers who had originally stopped Webster and Williams that the two men had guns and that Mobley conducted the interrogation. In addition, the two $10 bills recovered from plaintiff and the receipt signed by Williams at 4:20 p.m., upon which the serial numbers of the bills had been recorded, were admitted into evidence. The fact that plaintiff arrived at the store at the appointed time also strongly corroborates Williams's testimony. Plaintiff points to conflicting evidence in the record, including Webster's testimony that Williams was not in the police car, the denials by the uniformed officers that money was ever mentioned, and plaintiff's and his partner's versions of the events of March 10 and 11. But such conflicts are to be resolved by the agency, which heard the testimony and observed the witnesses. (*Crowell v. Police Board* (1975), 32 Ill. App. 3d 552, 336 N.E.2d 573.) Having reviewed the record, we cannot say that an opposite conclusion is clearly evident.

Plaintiff also argues that there was no evidence whatsoever that Williams and Webster were carrying concealed weapons on March 10, 1970, and that there was no violation of the law shown. But the record reveals that Webster told the uniformed officer who stopped him that both he and Williams had guns. This was apparently a violation of section 24—1(a)(4) of the Criminal Code of 1961 in effect at the time (Ill. Rev.

Stat. 1969, ch. 38, par. 24—1(a)(4)); the exemption for licensed security guards now part of the Code was not effective until September 8, 1971. (Ill. Rev. Stat. 1971, ch. 38, par. 24—2(a)(4).) Therefore, the Board properly found that the guns should have been confiscated and inventoried and the men arrested, in compliance with Rule 5.

It is evident that the most serious charges against plaintiff were not whether he violated the rule requiring evidence to be inventoried on two occasions, but rather whether he, in his official capacity, extorted bribes in return for not arresting persons for real or invented violations of the law. We find that the evidence presented was clear and convincing and proved that plaintiff, on two successive nights, threatened to arrest persons, then accepted or arranged to accept money in exchange for releasing the supposed offenders. Plaintiff has argued that if any of the charges are not sustained we should remand this case to the Board for reconsideration of the sanction imposed, citing *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371. But in that case, the court held that the most serious charges were not sustained, and that the fundamental fairness required a remand to the Board to reconsider the discipline to be imposed. We do not believe that the discipline of separation from the force imposed upon plaintiff would differ because of our ruling in regard to the Rule 37 violation of March 9. See *Crowell v. Police Board* (1975), 32 Ill. App. 3d 552, 336 N.E.2d 573.

Therefore, the finding of the Police Board of a violation of Rule 37 by plaintiff on March 9, 1970, is reversed, but in all other respects the judgment of the circuit court of Cook County upholding the decision of the police board is affirmed.

Judgment reversed in part and affirmed in part.

GOLDBERG, P. J., and McGLOON, J., concur.