DR. GERALD E. McCABE, Plaintiff-Appellant, *v.* THE DEPARTMENT OF REGISTRATION AND EDUCATION, Defendant-Appellee.

First District (3rd Division)    No. 79-573

Opinion filed November 26, 1980.

Robert E. Cleveland, of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Tyrone C. Fahner, Attorney General, of Chicago (Charles J. Pesek, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Dr. Gerald E. McCabe, filed an action in the circuit court of Cook County for administrative review seeking to set aside the decision of the medical disciplinary board which had ordered plaintiff's medical license revoked. The trial court affirmed the board's decision, and plaintiff appeals.

On July 28, 1976, defendant, Department of Registration and Education of the State of Illinois, petitioned for a temporary suspension of plaintiff's medical license pending a hearing before the Board. On July 29, 1976, the Department's chief regulatory officer presented evidence *ex parte* to the Director of the Department to indicate that plaintiff's practice of medicine constituted an immediate danger to the public. The Director temporarily suspended plaintiff's license and scheduled a full hearing before the Board on the Department's complaint against plaintiff.

The Department's 13-count complaint alleged in pertinent part that plaintiff was a duly licensed osteopathic physician and that during the first half of 1976, he had issued 7,208 prescriptions for various controlled substances; and that the number of prescriptions issued was inordinately large and excessive for the number of patients for whom the prescriptions were issued. The complaint further charged that plaintiff had issued 175 prescriptions on a single day, May 14, 1976. It also stated that plaintiff did not issue the prescriptions for legitimate therapeutic purposes; that he issued prescriptions for controlled substances for purposes of maintaining patient addictions and illegal distribution; and that such acts by plaintiff constituted grounds for revocation of plaintiff's medical license, all in violation of sections 16(4) and 16(19) of the Medical Practice Act. (Ill. Rev. Stat. 1977, ch. 111, pars. 4433(4) and 4433(19).) The Board denied plaintiff's motion to dismiss the complaint.

The hearing was conducted and testimony was heard on 15 separate occasions before a medical disciplinary board consisting of seven physicians. On nine of these occasions, less than a quorum of the board was present.

At the hearing, the Department sought to call Tony Marcantante as a witness. He was a patient of plaintiff and had received a number of prescriptions for controlled substances from plaintiff. Marcantante's counsel appeared on his behalf and disputed the validity of a subpoena requiring his client's presence. Counsel stated that if Marcantante were

compelled to appear, he would assert his fifth amendment privilege not to testify. When plaintiff was called as an adverse witness by the Department, he also asserted his fifth amendment right not to testify. Three members of the Board expressed disappointment over plaintiff's refusal to testify and one of the members stated that the Board would take into consideration his refusal to testify.

Lawrence B. Slotnik, drug compliance coordinator for the Department, testified that he directed a Mr. Shawn, a Department investigator, to serve a subpoena on Irving Cotovsky, owner of two pharmacies, for all prescriptions filled at the pharmacies between November 1, 1975, and June 1, 1976. He identified the Department's group exhibit as being the prescriptions obtained from the pharmacies by Shawn pursuant to subpoena. Slotnik testified that after making a study of the prescriptions, he turned them over to Dr. John Fultz, the Department's medical coordinator.

Dr. Fultz testified that he had reviewed all of the prescriptions contained in the Department's group exhibit. All bore plaintiff's name and address and a signature which usually read "G. McCabe." Fultz testified that the BND number assigned to plaintiff appeared on each of the prescriptions. He explained that a BND number is the number of a practitioner's license to prescribe controlled substances. There were approximately 7,200 prescriptions.

Doris Fischer, a data processor for the Illinois Bureau of Investigation, testified for the Department that she maintained detailed records of all State triplicate prescription blanks for designated controlled substances which were requested by and sent to physicians. She reviewed all 7,208 controlled substance prescriptions contained in the Department's exhibit and stated that 3,142 were written on these triplicate State prescription forms. Such forms are specially ordered by and issued to the physicians in numerical sequence, thereby providing a system of accountability. Fischer compared her records with the prescription forms and concluded that all 3,142 prescription forms had been requested by and sent to plaintiff. On two occasions plaintiff had called the witness to inform her that he had not received the triplicate forms. In each case, he called back a few days later to say that the forms had arrived. Fischer had never received any notification from plaintiff that any of the specially ordered prescription forms had been lost or stolen.

Luther Senter, a handwriting expert for the Federal Bureau of Investigation, testified for the Department that he had analyzed 5,944 of the 7,208 controlled substance prescriptions. Due to time constraints he was unable to analyze the remaining prescription forms. Senter also had examined handwriting of plaintiff; the handwriting lacked identifying characteristics, and the comparison was inconclusive. Senter stated, how-

ever, that in 2,897 prescriptions the handwriting in both the body of the prescription and the signature was within the range of plaintiff's writing ability. As to the remaining 3,047 prescriptions, the handwriting in the body of the form was inconsistent with plaintiff's ability but the signature was consistent with plaintiff's handwriting ability.

Dr. William E. Thornton, a physician and psychiatrist, was called as a witness by the Department. He testified that he was a consultant for the National Institute of Drug Abuse and had been medical director for the Illinois Drug Abuse Programs. He also was an associate professor of psychiatry at the University of Illinois School of Medicine. He testified that he had published approximately three dozen times on topics concerning substance abuse.

Dr. Thornton testified as to the nature, use, characteristics and normal therapeutic dosage ranges for controlled substances prescribed by plaintiff, including the drugs dilaudid, preludin, morphine sulfate (heroin) and ritalin. He also testified as to factors altering maximum dosage limits. These factors included such matters as the interaction of the controlled substance with other drugs, a patient's tolerance, effects of addiction or long term use, and oral or intravenous methods of administration. Dr. Thornton then examined the prescriptions for certain controlled substances given to particular patients of plaintiff from May 14, 1976, to June 1, 1976. He concluded that in the case of Gerald Berkowitz, the amounts of dilaudid prescribed far exceeded normal dosage ranges for all individuals except addicts. The amounts prescribed for Berkowitz would be fatal to most nonaddicted individuals.

Dr. Thornton also reviewed the prescriptions issued by plaintiff to Alfred Glenn. The prescriptions were for various amounts of morphine sulfate, preludin and ritalin. The amounts of morphine sulfate prescribed were grossly outside the normal dosage range for a nonaddicted individual, and Dr. Thornton knew of no medical reason for the great amount prescribed. Dr. Thornton noted that the morphine sulfate and ritalin prescriptions for Glenn were often issued on the same day. There was no apparent pattern for issuing prescriptions to Glenn or indications that the dosages were being progressively reduced.

Dr. Thornton then reviewed the prescriptions issued to Marcantante for morphine sulfate. He testified that the dosage and frequency of the prescriptions would be potentially lethal and excessive to an individual not addicted to the drug and concluded that the prescriptions given also would be inconsistent with detoxification or an addiction maintenance program. Dr. Thornton was aware of no drug abuse program which would utilize the large quantities prescribed for Marcantante. He stated that the amounts of morphine sulfate prescribed would be excessive even for an individual addicted to the drug.

Dr. Thornton next examined the prescriptions issued to Margaret Gonzales for dilaudid, morphine sulfate and preludin. The dilaudid prescriptions were excessive for a nonaddicted individual, and there was no therapeutic purpose for issuing prescriptions of preludin and dilaudid together.

Dr. Thornton also reviewed the prescriptions given to Glenn Baker for morphine sulfate. He noted several instances in which more than one prescription for morphine sulfate was issued to Baker on the same day. The witness knew of no therapeutic purpose for prescribing such amounts of morphine sulfate to either a nonaddicted or addicted individual.

In a similar manner, Dr. Thornton reviewed the prescriptions of several other patients of plaintiff, including the prescriptions for Marty Kaprelian, Ken Kosyuba, John Lawlor, Pat Davies and Laura Dukes. In each instance, he concluded that the amounts of controlled substances prescribed were excessive for nonaddicted individuals. Dr. Thornton knew of no therapeutic purpose for issuing this number of prescriptions, regardless of whether the individual was addicted or nonaddicted.

During a vigorous and detailed cross-examination, Dr. Thornton acknowledged that some of the three dozen publications he claimed had been accepted for publication had not yet appeared publicly, while some of them consisted of letters to editors. He had never personally examined plaintiff's patients or reviewed any of their medical histories. These were necessary prerequisites to recommending treatment. Dr. Thornton repeated his opinion that there was no therapeutic purpose for the amount of drugs prescribed by plaintiff. He was aware that a text on which he placed some reliance disagreed with some of his conclusions about how much morphine sulfate an individual could absorb without ill effect.

After the Department rested, plaintiff submitted a transcript of testimony from an earlier hearing before the board of pharmacy. The board of pharmacy had conducted a hearing to decide whether the pharmacy licenses of Irving Cotovsky should be revoked. The issue in that case was whether the filling of plaintiff's 7,208 prescriptions constituted grounds for revocation of the pharmacy licenses. Dr. Norman Farnsworth and Dr. Phillippe Benoit, both professors in the University of Illinois Medical Center Department of Pharmacology, had testified for the pharmacist, and it was the transcript of their testimony in that proceeding which plaintiff offered in evidence.

Dr. Farnsworth had stated that in evaluating the therapeutics of various drug dosages, several factors such as age, sex, weight, method of administration and patient tolerance should be considered. He noted that an individual's tolerance for morphine drugs increases with extensive use.

He concluded that the amounts prescribed by plaintiff were not necessarily lethal and that, as a pharmacist, he would have filled the prescriptions. The prescriptions were unusual, and the witness would have talked to plaintiff before filling the prescriptions.

Dr. Benoit had stated that he examined the prescriptions for morphine sulfate issued to plaintiff's patients and stated that, as a pharmacist, after contacting the physician, he would have filled the prescriptions. He noted that renal colic, a condition for which certain prescriptions were written, causes severe abdominal pain, and that the amount of morphine sulfate required to alleviate that pain might not exceed the amount prescribed for Glenn Baker. He was aware of recorded instances of patients receiving drug dosages which exceeded the amounts prescribed by plaintiff. Dr. Benoit stated that combining preludin and morphine sulfate was not improper as such combinations could reduce undesired side effects of narcotics.

At the conclusion of the hearing, the board took the matter under advisement. After reviewing the transcript of the proceedings, the board found that plaintiff's method of prescribing controlled substances was unethical and harmful to the public, and that plaintiff had issued prescriptions for controlled substances for other than therapeutic purposes. The board recommended that plaintiff's license to practice medicine be revoked. After a denial of plaintiff's motion for a rehearing, the Director ordered plaintiff's license revoked.

We initially shall consider plaintiff's various claims that he was denied a fair and impartial hearing by the Board.

■■ Plaintiff maintains that the failure of the Board to have a quorum present during each instance in which testimony was heard deprived him of a fair hearing. Due process safeguards and protections apply to medical license revocation proceedings. (*Stojanoff v. Department of Registration & Education* (1979), 72 Ill. App. 3d 584, 391 N.E.2d 10.) Due process does not require, however, that a quorum of the decision-making board must personally hear all the evidence in order for an administrative determination to be valid. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 357 N.E.2d 785.) The requirements of due process are met if the administrative agency considers the evidence contained in the transcript of the proceedings and bases its decision thereon. (*Homefinders, Inc. v. City of Evanston.*) In *Bruns v. Department of Registration & Education* (1978), 59 Ill. App. 3d 872, 376 N.E.2d 82, only one board member was present during a medical license revocation proceeding. Nevertheless, the court held that a quorum of board members is not required to be present at an evidentiary hearing and that procedural due process is satisfied where the board reviews the transcript of proceedings

before making its findings and recommendation. Similarly, an absence of a quorum at times while testimony was being taken in the present case did not deprive plaintiff of due process.

■■ Plaintiff urges, however, that individual board members did not review the transcript of proceedings but relied upon an abstract prepared by one board member. This argument would have validity, but it finds no support in the record. Minutes of a board meeting referred to a proposal that the board members assigned to a case be required to prepare an abstract of the most significant testimony. That same proposal required each board member to read the entire transcript. During his argument for rehearing, plaintiff's trial counsel stated that he had talked to one board member who said, at that time, he had not read the transcript. Aside from the clearly improper nature of such an alleged conversation, plaintiff has not suggested any time or place of such a conversation. Nor does he allege that the purported conversation occurred after the board's recommendations were made. Plaintiff's assertion of impropriety on the part of a board member is insufficient to raise a legitimate due process argument.

Plaintiff also argues that his rights secured by the fifth amendment were violated because a sanction or penalty was imposed upon him for his failure to testify.

In *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625, the United States Supreme Court held that an attorney could not be disbarred merely because he refused to produce demanded documents or to testify at the judicial inquiry. Our supreme court, in *In re March* (1978), 71 Ill. 2d 382, 376 N.E.2d 213, held that an attorney in a disciplinary hearing may be compelled to testify if he is granted immunity from the use of such testimony at subsequent criminal proceedings and is so informed at the disciplinary hearing.

Plaintiff here was not compelled to testify at the hearings before the board. He complains, however, that various remarks made by several board members and the Department's counsel regarding his failure to testify were prejudicial and constituted an impermissible "cost" exacted for the exercise of his fifth amendment privilege. At one hearing, a board member stated that the board would be "very pleased" if plaintiff would testify, and upon his refusal, commented that the board would take into consideration that he refused to testify. Another member pleaded with plaintiff to say "something." At a subsequent hearing, another board member remarked, "[T]he Board was somewhat disappointed that it was necessary for [plaintiff] not to respond to questions, but we respect his right not to do so." Plaintiff further objects to a comment made by the Department's counsel that "[plaintiff] has been unwilling to answer any questions." The latter remark was made in the course of counsel's argu-

ment urging the board to order plaintiff to provide handwriting exemplars. In our view, these comments are innocuous and do not demonstrate substantial prejudice to plaintiff.

■■ Moreover, unlike the situation presented in *Spevack*, the record does not demonstrate that plaintiff's medical license was revoked because he asserted his privilege against self-incrimination. Nothing in the board's findings indicates that its final determination was based in part or in whole upon plaintiff's refusal to testify. We thus conclude that the objectionable comments did not violate plaintiff's rights secured by the fifth amendment.

Plaintiff further contends that he was denied a fair and impartial hearing by the conduct of the Department and its counsel. He first argues that the Department failed to comply with his request for discovery. Plaintiff asserts that he made a request for the production of an electronic surveillance report involving him prior to the hearing. At that time, counsel for the Department stated that no such report existed. During the hearing, counsel tendered the report to plaintiff's attorney and apologized for the oversight.

The purpose of pretrial discovery is to aid the party in the preparation and presentation of his case or defense, and to eliminate surprise as much as possible. (*Wegmann v. Department of Registration & Education* (1978), 61 Ill. App. 3d 352, 377 N.E.2d 1297.) In an administrative proceeding, an agency is required to disclose evidence in its possession which might be helpful to an accused. *Wegmann v. Department of Registration & Education.*

■■ In the present case, plaintiff requested an electronic surveillance report sometime prior to the hearing. It appears, however, that only an authorization for electronic surveillance was granted and that electronic surveillance was never conducted. While it is true that Department's counsel apparently overlooked a report in his file concerning plaintiff, the record demonstrates that counsel for the Department tendered the report to plaintiff's trial counsel during the proceedings when it was discovered. Moreover, it appears that plaintiff was not prejudiced by the delay. The Department did not use the report in the presentation of its case and, upon receiving it, plaintiff's counsel made no further reference to it.

Plaintiff also complains, without any justification, that he was treated unfairly because the counsel for the Department did not send all the prescriptions to the F.B.I. for analysis by a handwriting expert. Senter testified that he examined 5,944 out of the 7,000 prescriptions. He did not state that all of the prescriptions were not delivered to him, but explained that time constraints did not permit him to examine the remaining prescriptions.

■■ We also hold that the trial court applied the proper standard for

administrative review. In rendering his decision, the judge stated that a court should not disturb administrative findings unless they are arbitrary or constitute an abuse of discretion. He further pointed out that what the board lacked in legal sophistication, it made up for in medical knowledge, which equipped it to assess credibility of conflicting medical testimony.

The findings and conclusions of the administrative agency on questions of fact are to be held prima facie true and correct. (Ill. Rev. Stat. 1977, ch. 110, par. 274.) It is not the function of the reviewing court to reweigh the evidence or make independent determinations of fact. (*General Electric Co. v. Illinois Fair Employment Practices Com.* (1976), 38 Ill. App. 3d 967, 349 N.E.2d 553.) In reviewing an agency's action, the court must decide whether the agency's determination is against the manifest weight of the evidence. (*Unger v. Sirena Division of Consolidated Foods Corp.* (1978), 60 Ill. App. 3d 840, 377 N.E.2d 266.) For a judgment to be against the manifest weight of the evidence, it must appear that conclusions opposite to those reached by the agency are clearly evident. *Mobley v. Conlisk* (1978), 59 Ill. App. 3d 1031, 376 N.E.2d 247.

The board in the present case made two findings against plaintiff: that his method of prescribing controlled substances constituted an unethical practice of medicine harmful to the public in violation of section 16(4) of the Medical Practice Act; and that plaintiff issued medical prescriptions for controlled substances for other than therapeutic purposes in violation of section 16(19) of the Act. Both findings were supported by substantial evidence.

■■ Plaintiff claims that the Department failed to establish a proper foundation for the prescriptions because it failed to produce the original subpoena on the pharmacies and the party serving the subpoena did not testify. The Department, however, presented evidence that all of the 7,208 prescriptions for controlled substances during the brief period in question contained plaintiff's name, address and BND number. Approximately half of that number of prescriptions were on serially numbered triplicate forms which had been requested by and sent to plaintiff. And while plaintiff occasionally complained to the State about delay in receiving these forms, he never reported any forms as lost or stolen. Additionally, a handwriting expert testified that the signatures on the prescriptions were within plaintiff's writing ability. The Department established by overwhelming circumstantial evidence that plaintiff issued the prescriptions. The resultant determination by the Board that the issuance of such a vast number of prescriptions for controlled substances in a short period of time constituted an unethical practice of medicine was not contrary to the manifest weight of the evidence.

■■ As to the second finding, the Department established by the expert

testimony of Dr. Thornton that there was no therapeutic purpose for the prescriptions issued by plaintiff. While minor contradictions and discrepancies appear in his testimony under a thorough cross-examination, the board's reliance on his expert testimony was not obviously wrong. The board's decision that plaintiff issued medical prescriptions for controlled substances for other than therapeutic purposes is not contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

SIMON and RIZZI, JJ., concur.