CURTIS BETTS *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* THE DEPARTMENT OF REGISTRATION AND EDUCATION, Defendant-Appellee and Cross-Appellant.

First District (1st Division)    No. 81-456

Opinion filed December 28, 1981.—Rehearing denied February 1, 1982.

Kenneth K. Ditkowsky, of Chicago, for appellants.

Charles J. Pesek, of St. Charles, for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs, Curtis Betts and Curtis Pharmacy, Inc., appeal from the decision of the circuit court which affirmed the order of defendant, Department of Registration and Education, which revoked the pharmacy licenses of plaintiffs. Defendant cross-appeals from the decision of the trial court which reversed the order of revocation of the pharmacy license of plaintiff Alfred Evans, Jr. On appeal, Betts and the pharmacy contend that: (1) when an administrative hearing is of a quasi-judicial nature, the liberty and property of citizens shall be protected by the rudimentary requirements of fair play; (2) the conducting of proceedings under unpublished rules and regulations violates due process; (3) when an individual has his license revoked pursuant to an unsworn allegation that he committed a felony, and subsequent proceedings nullify the conviction, a new hearing should be held to determine if revocation was warranted; (4) in applying the statutory criterion mandated by the Illinois legislature, the Illinois Constitution of 1970 and the first 10 amendments to the United States Constitution, the decision of the circuit court and the Board of Pharmacy must be reversed; and (5) when two members of the Board of Pharmacy who were not on the original panel rule on the right of plaintiff to maintain his professional license and said members, without reading the transcript or hearing any evidence, sign the recommendation to revoke, such recommendation is a nullity. On cross-appeal, defendant contends that the term "gross immorality" is not unconstitutionally vague and that the revocation of Evans' license should be reinstated.

For the reasons set forth herein, we affirm the revocation of the licenses of Betts and the pharmacy and reverse and remand the matter pertaining to the revocation of the license of plaintiff Evans.

On February 9, 1978, Algis Augustine, chief regulatory officer of the Department of Registration and Education (DRE), filed an administrative complaint against Curtis Betts, Curtis Pharmacy, Alfred Evans and Stephen Davis. The complaint alleged that Betts and Davis had been convicted of a felony; that various sales of prescription drugs had been made by an unlicensed individual and without a prescription; that Betts and Evans failed to supervise the operations of Curtis Pharmacy, that Betts and Evans failed to keep adequate records; that Betts and Evans failed to account for approximately 1,500,000 tablets of Talwin and Pyribenzamine, both of which are prescription drugs; and that Betts permitted Davis, who was licensed as an apprentice pharmacist, to operate the pharmacy and handle pharmacy records without supervision. At the time the complaint was filed, Augustine also filed a petition seeking the summary suspension of the licenses of Betts and Curtis Pharmacy because the practice of pharmacy by Betts and the pharmacy constituted "an imme-

diate danger to the public." On February 9, 1978, an *ex parte* hearing before the Director of DRE was held and the Director ordered the immediate suspension of the licenses of Betts and the pharmacy pending a full hearing within 15 days. On February 9, 1978, copies of the Director's order of suspension, the complaint and petition were served upon Betts' wife and were mailed to Betts. On February 10, 1978, a notice of hearing and a copy of the complaint was sent to each of the individuals named in the complaint.

On February 17, 1978, the Board of Pharmacy informed counsel for plaintiff that rather than proceed with the hearing scheduled for that day, it would seek appointment by the Director of a hearing officer to preside over the hearing. The board told counsel that it felt that the appointment of a hearing officer would expedite the hearing process because the matter before it was an emergency and because it might not be possible for a majority of the board to be present at each session. On February 22, 1978, the Director appointed a hearing officer. The order of the Director required that at least one member of the board be present during the hearing. The hearing officer was precluded from making reports or recommendations concerning the disposition of the case against Betts and the others.

During the course of the hearing which commenced on February 22, 1978, counsel for plaintiffs requested that the Director and Augustine be called to testify. The hearing officer refused this request because he felt that it would not be proper for the Director to testify because she was the ultimate judge in the administrative proceedings and that it would not be proper for Augustine to testify because he was prosecuting the case on behalf of the Board of Pharmacy. At numerous times throughout the hearing, counsel for plaintiffs attempted to portray the entire proceedings against Betts and the others as a conspiracy which violated their civil rights. Counsel also sought disclosure of the events that transpired at what he termed "secret" meetings.

Following an extensive hearing which was conducted on March 9, 1978, the Board of Pharmacy rendered its recommendations and findings of fact and conclusions of law on March 30, 1978. The board found that Betts had been convicted of a felony; that illegal drug sales had occurred on the premises of the pharmacy while Evans was in the pharmacy; that there were large shortages of drugs which were not accounted for by Betts; that Betts permitted an apprentice pharmacist to operate the pharmacy without supervision; that Betts failed to establish and supervise a method for safekeeping and storage of drugs; that Betts failed to keep adequate records for certain controlled substances; that Evans aided and abetted Betts in Betts' failure to account for large quantities of prescription drugs and that Evans was "grossly immoral" by permitting the sale of

large quantities of drugs without a prescription by individuals not licensed to dispense drugs. On April 11, 1978, counsel for the licensees petitioned the Director to vacate the findings and conclusions of the board. After a hearing was held, the Director entered an order on April 27, 1978, which revoked the licenses of Betts, Curtis Pharmacy and Evans. Plaintiffs petitioned the circuit court for review of the decision of the Director. Prior to the court's decision in the case, the felony conviction of Betts was reversed without remand by this court in *People v. Betts* (1979), 78 Ill. App. 3d 200, 397 N.E.2d 106, because the indictment was improperly amended. This court found that it would be impossible to prove the charges in the unamended indictment because of a technical error. The trial court was apprised of the reversal of Betts' conviction and remanded the matter to defendant "for reconsideration of the sanction imposed for the reason that the decision, at least in part, under review was based upon a criminal conviction which has been subsequently overturned." Upon remand, the board recommended, and the Director agreed, that Betts' license be revoked despite his conviction being reversed. The court then considered this decision of the Director to revoke the licenses and affirmed the revocation of the licenses of the pharmacy and Betts. The court, however, reversed the revocation of the license of Evans because the term "gross immorality" was unconstitutionally vague. Betts and the pharmacy appeal seeking reversal of the trial court's decision. Defendant cross-appeals contesting the reversal of the suspension of Evans' license.

## I

Although plaintiff Betts and Curtis Pharmacy have raised five issues for review, we shall consider the issues in the same fashion as the circuit court did. We view the issues to be: first, whether the decision of defendant was against the manifest weight of the evidence and, second, whether any constitutional violations marred plaintiffs' right to a fair and impartial hearing. Plaintiff claims that the decision of the Director was against the manifest weight of the evidence. A review of the record discloses that the Department of Registration and Education offered the testimony of Officer Thomas Eichler to establish that illegal sales of controlled substances had occurred while Betts was the pharmacist in charge and Evans was the pharmacist on duty at the pharmacy. Eichler testified that on November 1, 1977, he observed four separate sales of pills to individuals without prescriptions. Eichler identified the individuals who made the sales as James Gates and Carlton Betts, neither of whom were licensed pharmacists. Eichler testified that when he entered the pharmacy Evans and others threw pills and money on the floor. According to Eichler's testimony, Evans initially denied any association with the pharmacy. The pills which Eichler observed being sold were subse-

quently identified as the prescription drugs Valium and Talwin. Officer John Corcoran testified that he and his partner had set up a surveillance of the pharmacy on October 27, 1977. Corcoran stated that he and his partner entered the pharmacy after a sale of a large quantity of drugs was observed. He stated that behind the pharmacy counter he found three paper bags which contained pills and which bore the nicknames of three persons. Corcoran testified that he also found two firearms and a box containing a substantial sum of money. Corcoran stated that the pills in the bags were tested and identified as Talwin.

The Department of Registration and Education next presented evidence and witnesses to establish the alleged violations in storage, record-keeping and dispensing of drugs. Invoices from Zahn Drugs, a supplier, were introduced to establish that Betts purchased 195 cases of Talwin from October 3, 1977, to January 11, 1978, for about $165,000. Irwin Tchon, a DRE investigator, testified that he conducted an investigation of the pharmacy on January 15, 1978. Tchon requested the prescription file from Betts and Evans for the period from January 1, 1977, through January 15, 1978, because Tchon wanted to conduct an accountability audit for Talwin. Tchon stated that Evans only produced three prescriptions from 1978 for that period that he had requested the prescription file. Two prescriptions were for Talwin. Tchon also stated that Evans showed him 10 100-tablet bottles and told him that the bottles represented the only Talwin in the pharmacy. On cross-examination, Tchon stated that no special records, except normal business records, are required to be kept for Talwin. Tchon also stated that pharmacists are required to account for any prescription drugs purchased. DRE investigator Piacentini testified that in June 1977 he conducted an audit of the pharmacy and noticed that there had been purchases of 133,800 Talwin and 166,600 Tripelannamine. He testified that Betts was not able to produce prescriptions for those drugs although there were only 5,000 Tripelannamine and no Talwin in stock. Piacentini stated that Betts claimed that he had sold the drugs to other pharmacies, although Betts refused to disclose any names to him. United States Drug Enforcement Agent Cutright testified that he questioned Betts about his pharmacy records in March 1976. Cutright stated that Betts knew little or nothing about the pharmacy records. Betts told Cutright that Davis handled the operation of the pharmacy and that Betts knew that Davis was an apprentice pharmacist. Betts also told Cutright that he knew that he was obligated to physically supervise Davis. Cutright stated that he was not able to audit the pharmacy because no records were available at the time.

Betts and Evans offered the testimony of Charles and David Johnson to impeach the testimony of Officer Eichler. David Johnson stated that Eichler entered his home and arrested his wife. Johnson stated that

Eichler told him that he wanted Betts and that if Johnson "could give him Betts," Eichler would let Johnson go. Charles Johnson's testimony corroborated the raid at David Johnson's home. Alfred Evans testified that on October 27, 1977, Officer Corcoran entered the pharmacy, jumped on the prescription counter and began to throw various items, including the prescription file. Evans stated that Corcoran forced people on the street into the pharmacy and searched them for drugs. At the time that Corcoran and Eichler entered the pharmacy, Evans claimed that he was eating dinner. Evans denied that he attempted to hide any pills or money when the officers entered the store. He testified that Eichler threatened to blow up the pharmacy and that Eichler and others threatened to kill people in the store. On cross-examination, Evans stated that, although he had not seen a copy of the rules and regulations governing the practice of pharmacy since he first was registered, he was aware that a pharmacy was required to keep records for the sale, purchase, possession, storage and return of pharmaceuticals. Evans testified that the pharmacy records were kept on a sheet of paper which Evans gave to Betts every evening. Evans testified that on October 3, 1977, he paid for 12 cases of Talwin with $10,572.71 in cash. Evans also testified that between October 1977 and January 1978 he received additional cases of Talwin, including 76 cases of Talwin in October. Evans stated that the Talwin was "brokered" to other pharmacies, although he refused to divulge the names of any pharmacies to which the Talwin was sold. When asked about the January 15, 1978, audit, Evans was not able to account for the prescription files and failed to provide an explanation of what happened to 32 cases of Talwin which were purchased prior to the audit in January 1978.

Betts testified that he was aware that a pharmacy is required to account for prescription drugs, although no special records for Talwin were required. Betts corroborated Evans' testimony that he was seldom at the pharmacy. Betts stated that he felt that it was pertinent to keep records for controlled substances, but that it was worthless to keep records for noncontrolled substances. Betts testified that he kept private records for tax purposes, but he refused to permit anyone to see those records. Betts stated that the Talwin and Tripelannamine purchases made between October 1977 and January 1978 were bought for other pharmacists whose identity he refused to disclose. Betts stated that he accepted responsibility for his refusal to account for such large amounts of pharmaceuticals. Betts testified that Davis, an apprentice pharmacist, operated the pharmacy while Betts was attending to his Michigan resort and that if any drugs were missing, Davis disposed of them without Betts' knowledge. Betts stated that he had never sold prescription drugs to a customer without a prescription. He stated that he was convicted of illegal delivery of a controlled substance but that the conviction is on appeal because

there were irregularities at his trial. Betts also stated that at the time the felony was committed, he was not in town.

■■ We reject the contention of plaintiffs that the decision of the trial court was against the manifest weight of the evidence. A careful review of the testimony and the record in this case discloses ample support for the decision of defendant. Therefore, the decision of the trial court was correct in upholding the administrative decision, especially in light of Betts' refusal or inability to account for the enormous purchases and distribution of drugs where a prescription is required for retail sales.

## II

The plaintiffs next contend that their right to due process was violated because hearings in the matter of the license suspensions were held in the presence of an appointed hearing officer and at least one member of the board. Plaintiffs argue that the statute requires a quorum of the board to be present in order for any business to be transacted (Ill. Rev. Stat. 1977, ch. 111, par. 4108), and that, by failing to have a quorum present during each hearing session, the board did not have power to act. Defendant argues that the statutory requirement does not mean that a quorum of the board must be present to hear the evidence presented in order to make findings and recommendations to the director. (See *Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 357 N.E.2d 785; *McCabe v. Department of Registration & Education* (1980), 90 Ill. App. 3d 1123, 413 N.E.2d 1353, *cert. denied* (Oct. 5, 1981), 50 U.S.L.W. 3056.) Defendant contends that plaintiffs' complaint that "the Board never met, and in fact lawyers for the Department who represented the complainant wrote the decision" and that the decision of the board was "manufactured" is not supported by the record. Defendant argues that the bare assertion of impropriety on the part of the board by plaintiffs is insufficient to establish any wrongdoing by the board.

■■■ In the absence of a statutory provision to the contrary, it is not necessary that those persons who are ultimately charged with making findings of fact, conclusions of law, recommendations or administrative decisions be personally present to hear evidence presented during an administrative proceeding. (See *Morgan v. United States* (1936), 298 U.S. 468, 80 L. Ed. 1288, 56 S. Ct. 906; *Homefinders, Inc. v. City of Evanston*; *McCabe v. Department of Registration & Education.*) In *Homefinders, Inc.*, our supreme court stated:

> "*Morgan* and other Federal decisions have consistently recognized that, in the absence of statutory provisions to the contrary, it is not necessary that testimony in administrative proceedings be taken before the same officers who have the ultimate decision-making authority. [Citations.] They indicate to the contrary that adminis-

trative proceedings may be conducted by hearing officers who refer the case for final determination to a board which has not 'heard' the evidence in person. The requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determinations thereon. [Citations.]" (65 Ill. 2d 115, 128, 357 N.E.2d 785, 791.)

In the instant case, the Director appointed a hearing officer to expedite the hearing of evidence. In addition, the Director required that at least one member of the board be present for each session. In its recommendations and findings of fact and conclusions of law submitted to the Director, the board stated that each board member was furnished with a transcript of the proceedings, that each member read the transcript and that each considered the evidence presented therein. We believe that the actions taken by the Director, upon recommendation by the board, are in accord with *Homefinders, Inc.*, and our recent decision in *McCabe*. Plaintiffs have failed to establish that their rights were prejudiced by the procedures employed by the board. Under the controlling decisions of *Homefinders, Inc.*, and *McCabe*, the ruling of the trial court was correct.

Plaintiffs next argue that defendant violated their right to due process, as well as the provisions of the Open Meetings Act (Ill. Rev. Stat. 1977, ch. 102, par. 41 *et seq.*), because the board met in secret and without notice to plaintiff during the summary suspension hearing. Plaintiffs also contend that the board held "secret" meetings which involved the disposition of the proceedings against plaintiffs and which were in violation of the Open Meetings Act. Plaintiffs urge that a violation of the Open Meetings Act voids the actions taken by the board at a "secret" meeting. Defendant argues that the plaintiffs ignore the purpose of the summary suspension procedures because the procedures are designed to permit an administrative agency to act quickly when, in the agency's determination, prompt action is required to protect the public welfare. (Ill. Rev. Stat. 1977, ch. 127, par. 1016.) Defendant contends that summary suspension procedures have been upheld on due process grounds. See *Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893.

■■ ■ We need not address plaintiffs' contention that the summary suspension procedures violate their right to due process because we view the issue as moot. After the summary suspension procedure which resulted in the initial suspension of plaintiffs' licenses, plaintiffs received proper notice and a full hearing on the administrative complaint. It was from this hearing that appeal was taken to the circuit court. Plaintiffs complain that the board held secret meetings. Plaintiffs have not cited any facts in the record to support this claim, nor are we able to discern from

plaintiffs' brief when these alleged meetings occurred and what, if anything, transpired at these meetings. In any event, although a public agency which is subject to the provisions of the Open Meetings Act may have conducted business, such as deliberations, at a closed session, this does not necessarily result in the actions taken at such a meeting being null and void. See *In re Organization of Byron Park District* (1978), 67 Ill. App. 3d 61, 385 N.E.2d 67; *Board of Education v. County Board of School Trustees* (1978), 60 Ill. App. 3d 415, 376 N.E.2d 1054.

Plaintiffs next contend that they were entitled to a *de novo* hearing before the board after the circuit court remanded the matter to the board because Betts' conviction of a felony had been reversed on appeal. Defendant argues that it is significant that after the reversal of the conviction the circuit court remanded the matter to the board for reconsideration of this very sanction as claimed by plaintiffs. The language of the circuit court's order clearly indicates that only sanctions were to be reconsidered and, therefore, plaintiffs' contention that the court ordered a new hearing before the board is without merit.

Plaintiffs also have raised numerous other issues which we decline to discuss because they have failed to set forth and point out matters in the record to support their claims or to adequately argue such claims.

### III

On cross-appeal, defendant contends that the trial court erred in reversing the revocation of plaintiff Alfred Evans' license on the grounds that the term "gross immorality is too vague a standard against which normal, intelligent persons can gauge their conduct." Defendant argues that the trial court erred in failing to give proper weight to the administrative agencies who are charged with the interpretation of the laws, rules and regulations and a reasonable interpretation must be left to the agency. (See *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3.) Defendant has cited *Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 387 N.E.2d 300, where the term "gross immorality" was involved. In *Miller*, the supreme court held that the conviction of a pharmacist who had made illegal kickbacks to nursing homes did not warrant the revocation of the pharmacist's license because such conduct did not constitute "gross immorality" under the same statute involved in the present case. Defendant argues that implicit in the *Miller* decision is that the term "gross immorality" is not unconstitutionally vague because the supreme court concluded that the pharmacist's conduct did not constitute "gross immorality." Defendant claims that if any doubt as to the term's constitutionality remained after *Miller*, it was removed in the supreme court's recent decision in *Chastek v. Anderson* (1981), 83 Ill. 2d

502, 416 N.E.2d 247, which was decided after the trial court's decision in this cause. In *Chastek* the court reaffirmed the use of the phrase in question and stated:

> "The rationale in the cases upholding these statutes is that it is impossible to categorize all the acts constituting terms such as 'unprofessional conduct' or 'gross immorality.' Further, terms such as 'unprofessional conduct' are susceptible to common understanding by the members of the profession. When combined with the legislative purpose of protecting the public from people unfit to practice, the term 'unprofessional conduct' provides fair notice to professionals and is not unconstitutionally vague." (83 Ill. 2d 502, 509, 416 N.E.2d 247, 251.)

Defendant asserts that after *Miller* and *Chastek* any doubt as to the term's vagueness has been removed and argues that, even if the trial court was correct in holding that the term "gross immorality" was unconstitutionally vague, there was sufficient evidence in the record to sustain the revocation of the license of Evans on the grounds that revocation is warranted if a pharmacist "is found to have wilfully violated any of the rules and regulations promulgated for the administration of [the Pharmacy Practice] Act." (Ill. Rev. Stat. 1977, ch. 111, par. 4019.) Defendant contends that the evidence sustained a number of wilful violations of the rules and regulations, particularly where there may have been a violation by the failure to maintain proper records as to the distribution of drugs where at least some records are required by statute. Ill. Rev. Stat. 1977, ch. 111, par. 4030.

Plaintiff Evans argues that the term "gross immorality" fails to inform plaintiff of conduct which could result in the revocation of his license. Plaintiff argues that to pass constitutional muster, the term must be able to be accurately and precisely defined. He also contends that, in the cases cited by defendant, there has been a criminal conviction which related directly to the practice of the profession of the licensee. Plaintiff argues that he has not been convicted of such an offense and asserts that *Chastek* is distinguishable from the instant case on the facts because in *Chastek*, a dentist was found to have committed extreme and repeated acts of malpractice which constituted "unprofessional conduct." Plaintiff contends that *Chastek* should be limited to its facts and should not be expanded to cover a situation such as the one which exists in the present case.

We note from the record that it does not appear that the trial court had the benefit of the supreme court's decision in *Chastek* at the time of its ruling that the term "gross immorality" was unconstitutionally vague. The statute under review provides that the Director may refuse to renew or may revoke or suspend the license of a person registered under the Pharmacy Practice Act, when, *inter alia*, the licensee is found to be guilty

of "gross immorality." (Ill. Rev. Stat. 1977, ch. 111, par. 4019.) Rule VII of the Rules and Regulations Promulgated for the Administration of the Illinois Pharmacy Act (1978) defines "gross immorality" to be "any act or practice which is inimical to the public health, safety and welfare as measured by the standards of the Board of Pharmacy, that is wilfully and knowingly committed or engaged in by the holder of a license or certificate of registration issued under the provisions of the Act." The term "gross immorality" cannot be read in a vacuum, but must be read in conjunction with the applicable statutes and administrative rules and regulations governing the practice of pharmacy. See *Chastek v. Anderson; Miller v. Department of Registration & Education.*

■■ In construing the meaning attached to a statutory provision, it is necessary to examine the language of the statute and its purpose. (See *Chastek v. Anderson; Miller v. Department of Registration & Education.*) Guided by the foregoing, we have examined the statute at issue and do not find that the term "gross immorality" as used therein is unconstitutional for any of the grounds asserted by plaintiff Evans. The statute places plaintiff Evans on notice that he could have his license revoked for engaging in repeated conduct which is "grossly immoral" and which is inimicable to the health, safety and welfare of the general public, as is alleged in the charges brought against plaintiff Evans. *Chastek* and *Miller* provide sufficient guidance and scope for determining on a case-by-case basis conduct constituting "gross immorality." From the record, it appears that the circuit court did not determine whether the findings and conclusions concerning the charges against plaintiff Evans were supported by sufficient evidence or were contrary to the manifest weight of the evidence. Therefore, it is necessary to remand this matter to the circuit court as the same relates to the plaintiff Evans for further proceedings consistent with this opinion.

Accordingly, the judgment of the circuit court of Cook County is affirmed as to plaintiffs Betts and Curtis Pharmacy, Inc. and reversed and remanded as to plaintiff Evans.

Judgment affirmed in part; reversed and remanded in part.

McGLOON and O'CONNOR, JJ., concur.