ARCH-VIEW CASINO CRUISES, INC., Petitioner, v. ILLINOIS GAMING BOARD, Respondent.

Fourth District    No. 4—93—0485

Argued May 25, 1994.—Opinion filed June 16, 1994.

Adam M. Kingsley, Michael A. Ficaro, and David B. Goroff (argued), all of Hopkins & Sutter, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General (argued), of counsel), for respondent.

JUSTICE GREEN delivered the opinion of the court:

This case is before us for judicial review pursuant to section 17.1(a) of the Riverboat Gambling Act (Act) (230 ILCS 10/17.1(a) (West 1992)) and Supreme Court Rule 335 (134 Ill. 2d R. 335) from a final order of the Illinois Gaming Board (Board) (230 ILCS 10/5(a)(1) (West 1992)) denying petitioner Arch-View Casino Cruises, Inc. (Arch-View), an owner's license to conduct a riverboat gambling operation (230 ILCS 10/6, 7 (West 1992)). The order was entered orally by the Board on May 3, 1993, by adoption of a recommended decision of an administrative law judge. Notice of that decision was mailed by the Board to Arch-View's counsel on May 5, 1993.

Arch-View contends that the Board's decision should be set aside because (1) the decision was contrary to the manifest weight of the evidence; (2) Arch-View was improperly denied its rights under the contested hearing provisions of the Illinois Administrative Procedure Act (Procedure Act) (5 ILCS 100/10—5 et seq. (West 1992)); and (3) Arch-View was denied due process rights. We disagree and affirm.

Section 7(e) of the Act (230 ILCS 10/7(e) (West 1992)) permitted the Board to issue up to five owner's licenses to become effective not earlier than January 1, 1991, and another five licenses to become effective not earlier than March 1, 1992, with one of that five to authorize gambling on the Des Plaines River in Will County. Arch-View sought one of the latter four licenses for a boat to be docked on a pier at the Village of Sauget, Illinois, a community of 197 people situated on the east bank of the Mississippi River in St. Clair County.

Section 7(b) of the Act (230 ILCS 10/7(b) (West 1992)) sets forth

the factors for the Board to consider in passing upon an application for an owner's license. They are (1) the character, reputation, experience, and financial integrity of the applicant or persons having direct or indirect ability to control the applicant; (2) the facilities available for the gambling; (3) the revenue the State is likely to receive from the gambling; (4) the good faith of the applicant in providing an affirmative action plan to recruit, train, and upgrade minorities in all employment classifications; (5) the ability of the applicant to provide liability and casualty insurance; (6) the adequacy of the applicant's capitalization; and (7) the extent to which the applicant meets other requirements the Board may adopt by rule. The Board adopted rules which also require an applicant to have (1) a background, reputation, and associations which will not result in adverse publicity for the State and its gaming industry; (2) adequate business competence and experience; and (3) adequate funding for the entire operation from a suitable source. 86 Ill. Adm. Code § 3000.230(c)(2) (1992).

The recommended order adopted by the Board emphasized that section 2 of the Act described a legislative intent to benefit the people of the State by assisting economic development and promoting tourism, which can be done only if public confidence and trust in the credibility and integrity of the gambling operation and regulating process are maintained. (230 ILCS 10/2(a), (b) (West 1992).) The order then (1) found a lack of showing that the operation would be adequately financed; (2) deemed the existing type of entertainment at the establishments near the docks as being too low-grade to attract tourists; (3) noted the lack of hotels in the area; (4) questioned the accuracy of calculations of the number of likely customers for the gambling boat; (5) questioned the reputation of at least one of the prospective employees; (6) noted that a person who would profit greatly if the boat was a success was a relative of the mayor of Sauget and a local official; and (7) pointed out that two Super Fund hazardous waste sites were close to the dock area.

The evidence presented before the Board was that Arch-View had only a minimum of cash and substantial debts, but almost all of its shares were owned by George E. Middleton. He did not testify, and he had not signed a purported financial statement of his which had been furnished with the application. Middleton's chief financial advisor, Gary Gill, testified that Middleton had accumulated a fortune of approximately $44 million through his ownership of Pizza Hut restaurants and could put $21 million into the instant project. Gill described Middleton as a very able person who had worked on the "Gemini" project for the Federal government at one time. According to Gill, Middleton had put approximately $453,000 into the project to

get the riverboat but had never been involved before in gaming operations. As Arch-View's financing was almost entirely dependent upon Middleton, and he had neither testified nor signed the financial statement which accompanied the application, the Board was justified in finding that Arch-View's ability to finance the project was not proved.

The evidence was undisputed that several of the few places of entertainment in Sauget were places where women entertainers remove their clothes. Reasonable minds may differ as to whether that atmosphere is likely to attract or turn away prospective gamblers. Some evidence was presented of plans to erect hotels in the area but no assurance existed that this would take place. The Board's decision that this environment would deter gamblers from coming to Sauget was not contrary to the manifest weight of the evidence.

Evidence was presented that originally, a well-established gaming company had been sought to manage the boat's gaming operation, but that plan had been abandoned because that company's fee request was too high. Instead, Jack Speelman was hired as gaming manager. He had been involved in the gambling industry since 1954 mostly in Las Vegas, Nevada, but he had never operated a gaming boat or an operation under Illinois law. He had been fired by the Tropicana Casino in that city. There, a dispute had arisen concerning an "irregularity" affecting a game that Speelman's daughter was supervising. He had hired her but did not fire her or other employees involved in that situation. Speelman testified that his firing was for other reasons. Speelman testified he had hired his daughter to be an assistant pit boss supervising certain game tables on the proposed boat.

Originally Middleton had a 60% interest in Arch-View and Vincent and Richard Sauget had most of the rest of the interest in equal shares. Vincent died and Richard succeeded to his interest. Others dropped out. Richard then entered into an agreement with Arch-View whereby Arch-View purchased and redeemed Richard's shares for a purchase price which was dependent upon the issuance of an owner's license and the successful operation of the gaming boat but which could result in a payment to Richard of between $600,000 and $1 million. Richard is a trustee of the Village of Sauget and a member of the St. Clair County Building Commission. His uncle is mayor of Sauget, and his cousin is on the township board. Richard is also the owner of or a substantial creditor of many of the businesses in the area. Richard clearly had an interest in the success of Arch-View and also obligations to the governmental units with which Arch-View

would be dealing. While all concerned would benefit by the success of Arch-View, the interrelationships involved were matters of concern for the Board as they could affect the reputation of the operation or its integrity.

The proposed dock site was approximately 1,000 feet north of a proposed Super Fund hazardous waste site and approximately 12,000 feet west of another such site. Testimony of an Illinois Environmental Protection Agency (Agency) project manager indicated that the sites "released or threatened releases of contamination *** impacting human health or the environment" with high levels of hazardous chemicals, including a carcinogen. He described the north site as one of the worst in the State. He noted that the village had placed a playground near it despite his warning. While the existence of these nearby sites is not directly listed as one for consideration in deciding whether to grant an owner's license, we hold that their existence bears upon the quality of the facilities available for gambling.

Gary Gill praised Middleton as an able, successful, and trustworthy business person. Several witnesses projected that the proposed boat would have sufficient customers to make the project profitable for its promoters, increase the revenue of the State, and promote, through tourism, the Sauget area. With projected highways being completed, the site could be reached from St. Louis in a very short time. Other testimony indicated that the dock site was excellent for keeping the boat. Other testimony indicated the project would create a substantial number of jobs, and the Village of Sauget had agreed to a plan for sharing the revenue with other hard-pressed areas.

However, the factual determination of the administrative agency must be upheld unless it is contrary to the manifest weight of the evidence. (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117.) Considering (1) the uncertain nature of the financing of Arch-View; (2) the question of whether the area surrounding the dock would attract customers and tourists; (3) the present lack of hotels; and (4) the evidence of proximity of a highly hazardous site near the boat dock, we cannot find that the decision of the Board to deny the owner's license was contrary to the manifest weight of the evidence. We have not discussed the contention that the survey of the number of probable customers testimony was invalid, because that is complicated and need not be shown to support the Board's decision.

Arch-View correctly points out that the supreme court made clear in *Balmoral Racing Club, Inc. v. Illinois Racing Board* (1992), 151 Ill. 2d 367, 403, 603 N.E.2d 489, 504-05, that in licensing proceedings before administrative agencies where notice and a right

to be heard was involved, section 10—65(a) of the then Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1010—65(a)) required that the contested case provision of the Procedure Act apply and that the parties involved are entitled to due process. Arch-View further notes that section 17 of the Act (230 ILCS 10/17 (West 1992)) also grants them the right to the contested case provision. It maintains it was granted neither those statutory rights nor due process.

Arch-View maintains that the Board considered factors not designated by section 7(b) of the Act. As we have indicated, we deem the matters considered do bear upon the section 7(b) factors. It asserts that it was denied an opportunity to make an offer of proof as to certain testimony Gill would make. The record indicates that a voluminous written offer was made, considered, and denied. The offer is replete with matter otherwise shown of record, hearsay, and argument. No error resulted from the refusal of the admission of the information set forth therein. Moreover, the purport of the matters set forth there is that Arch-View was unfairly treated because the Board did not act more rapidly. The information presented tends to indicate that the Board was slowed by change in membership and uncertainty arising from litigation concerning the validity of language in section 7(e) of the Act (230 ILCS 10/7(e) (West 1992)) which purported to require that one of the first five owner's licenses be from a dock at East St. Louis. The delay was unfortunate, but nothing alleged indicates it deprived Arch-View of any statutory or constitutional right.

Citing *McCabe v. Department of Registration & Education* (1980), 90 Ill. App. 3d 1123, 1131, 413 N.E.2d 1353, 1359, and *Wegmann v. Department of Registration & Education* (1978), 61 Ill. App. 3d 352, 356, 377 N.E.2d 1297, 1301, Arch-View asserts it was prejudiced by the failure of the Board to turn over to it information which was favorable to Arch-View. Those cases concerned the right of a person, respondent to a petition to revoke his or her license, to have such helpful information. Regardless of whether the holding of those cases is applicable here, no error resulted in this case. Arch-View indicates it did not know of a letter authored by the Agency representative who testified about the hazardous waste sites which impeached his testimony. However, Arch-View had the letter in time to use it to cross-examine that witness.

Arch-View argues that it cannot argue about the use it would put to information advantageous to it which the Board possessed but did not reveal to it, because it has no way of knowing what that information is. At the heart of Arch-View's concern is its contention that the Board did not treat it evenly with other applicants for license. It

seems to believe it is entitled to discovery as to every bit of information that bore upon the issuance of other licenses. It is entitled to obtain all public records it wishes in regard to the Board's activities but to require the Board to furnish all of the information it seeks and to allow it to use that information in support of its request would create interminable dispute. We know of no rule that requires that.

Arch-View places substantial significance on section 5(c)(1) of the Act, which empowers the Board:

"To investigate applicants and determine the eligibility of applicants for licenses and to *select among competing* applicants the applicants which best serve the interests of the citizens of Illinois." (Emphasis added.) (230 ILCS 10/5(c)(1) (West 1992).)

Arch-View maintains that no other application for an owner's license was before the Board at the time the Board denied Arch-View a license. As the interests of Illinois citizens is not mentioned in section 7(b) of the Act, Arch-View maintains the Board showed it considered an improper factor when it mentioned the "interests of citizens of Illinois" in denying Arch-View a license. While the Board should be careful in following only stated factors in passing upon license applications, we will not hold it to that much care with its language. Moreover, the words used by the Board referred to the stated purposes of the Act, which are inherently a matter to be considered as long as the evidence of specific factors supports the Board's order.

The evidence supported the Board's determination in denying the license application. We find no reversible error in the conduct of the hearing or the decision process. Accordingly, we affirm the order denying the owner's license.

Affirmed.

KNECHT and COOK, JJ., concur.