PAUL MORASKI ET AL. *v.* CONNECTICUT BOARD OF
EXAMINERS OF EMBALMERS AND
FUNERAL DIRECTORS
(SC 18248)

Rogers, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued January 14—officially released April 21, 2009

*William S. Palmieri*, for the appellants (plaintiffs).

*Patrick B. Kwanashie*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

KATZ, J. The plaintiffs, Paul Moraski and Colonial Funeral Home (Colonial), appeal from the trial court's judgment dismissing their appeal from the decisions of the defendant, the state board of examiners of embalmers and funeral directors (board), suspending and thereafter revoking Moraski's embalmer's license and Colonial's funeral home inspection certificate (certificate) and imposing a $50,000 fine on Moraski. The plaintiffs contend that the trial court improperly concluded that: (1) their challenge to the board's summary suspensions had been rendered moot; (2) the board had not abused its discretion or otherwise acted unlawfully in the procedures leading to the revocation of the license and certificate; and (3) the board had not abused its discretion in imposing the penalties of revocation and an excessive fine. We conclude that the trial court properly dismissed the plaintiffs' appeal and, therefore, we affirm the judgment.

The record discloses the following undisputed facts and procedural history. At all relevant times prior to November 15, 2005, Moraski held an embalmer's license and both owned and operated Colonial, which held a certificate that permitted it to operate its business in Hamden. On November 15, 2005, based on allegations of misconduct in connection with the funeral of Robert Foley, the department of public health (department), pursuant to General Statutes §§ 4-182 (c)[1] and 19a-17

___

[1] General Statutes § 4-182 (c) provides: "No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or

(c),[2] filed motions, along with supporting affidavits, seeking summary suspension of Moraski's license and Colonial's certificate on the ground that their "continued practice . . . represents a clear and immediate danger to the public health and safety." The department also filed a statement of charges against each plaintiff, alleging violations of General Statutes (Rev. to 2005) § 7-65[3] and General Statutes §§ 7-

welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined."

[2] General Statutes § 19a-17 (c) provides: "Such board or commission or the department where appropriate may summarily suspend a practitioner's license or permit in advance of a final adjudication or during the appeals process if such board or commission or the department finds that a practitioner or permittee represents a clear and immediate danger to the public health and safety if he is allowed to continue to practice." We note that § 19a-17 has been amended since the relevant period at issue in the present case, however, subsection (c) has remained unchanged. See footnote 17 of this opinion for the complete text of the relevant revision of § 19a-17.

[3] General Statutes (Rev. to 2005) § 7-65 provides: "The embalmer or funeral director licensed by the department, or licensed in a state having a reciprocal agreement on file with the department and complying with the terms of such agreement, who assumes custody of a dead body shall obtain a burial transit removal permit from the registrar of the town in which the death occurred not later than five calendar days after death, and prior to final disposition or removal of the body from the state. The burial permit shall specify the place of burial or other place of interment and state that the death certificate and any other certificate required by law have been returned and recorded. Such registrar shall appoint suitable persons as subregistrars, who shall be authorized to issue a burial transit removal permit based upon receipt of a completed death certificate as provided in section 7-62b, during the hours in which the registrar of vital records is closed. All such certificates upon which a permit is issued shall be forwarded to the registrar within seven days after receiving such certificates. The appointment of subregistrars shall be made in writing, with the approval of the selectmen of such town, and shall be made with reference to locality, to best accommodate the inhabitants of the town. Such subregistrars shall be sworn, and their term of office shall not extend beyond the term of office of the appointing registrar. The names of such subregistrars shall be reported to the Department of Public Health. The Chief Medical Examiner, Deputy Chief Medical Examiner and associate medical examiners shall be considered subregistrars of any town in which death occurs for the purpose of issuing burial permits and removal permits. The fee for such burial permit and burial transit removal permit shall be paid to the town in which the death occurred."

62b,[4] 7-64,[5] 20-230a[6] and 20-230b,[7] and claiming that these violations constituted grounds for disciplinary

[4] General Statutes § 7-62b (a) provides: "A death certificate for each death which occurs in this state shall be completed in its entirety and filed with the registrar of vital statistics in the town in which the death occurred no later than five days after death if filing a paper certificate and no later than three days after death if filing through an electronic death registry system, in order to obtain a burial permit prior to final disposition. The death certificate shall be registered if properly filed. If the place of death is unknown but the body is found in this state, the death certificate shall be completed and filed in accordance with this section, provided the place where the body is found shall be shown as the place of death."

[5] General Statutes § 7-64 provides: "The body of each person who dies in this state shall be buried, removed or cremated within a reasonable time after death. The person to whom the custody and control of the remains of any deceased person are granted by law shall see that the certificate of death required by law has been completed and filed in accordance with section 7-62b prior to final disposition of the body. An authorization for final disposition issued under the law of another state which accompanies a dead body or fetus brought into this state shall be authority for final disposition of the body or fetus in this state. The final disposition of a cremated body shall be recorded as the crematory. The provisions of this section shall not in any way impair the authority of directors of health in cases of death resulting from communicable diseases, nor conflict with any statutes regulating the delivery of bodies to any medical school, nor prevent the placing of any body temporarily in the receiving vault of any cemetery. The placing of any body in a family vault or tomb within any cemetery shall be deemed a burial under the provisions of this section. Any person who violates any provision of this section shall be fined not more than five hundred dollars or imprisoned not more than five years."

[6] General Statutes § 20-230a provides: "No licensed funeral director or licensed embalmer shall offer to sell services to arrange for or conduct funerals or offer to sell any merchandise used in connection with a funeral without first providing the purchaser of such services or merchandise with an itemized price list of all available services and merchandise and every such purchaser shall also be informed by such funeral director or embalmer, prior to entering into any sales agreement, of the right to select only such services or merchandise which the purchaser so desires."

[7] General Statutes § 20-230b provides: "No person engaged in the business of funeral directing and no licensed funeral director or licensed embalmer shall fail to provide the person making funeral arrangements or arranging for disposition of a dead human body, at the time funeral arrangements are completed and prior to the time of rendering service or providing merchandise, a written statement indicating to the extent then known: (1) The price of the service that the person has selected and what is included therein; (2) the price of each supplemental item of service or merchandise requested; (3) the amount involved for each of the items for which the funeral firm will advance money as an accommodation to the family of the deceased;

action pursuant to General Statutes § 20-227, including but not limited to subdivisions (2), (4) and (5).[8] That

and (4) the methods of payment. No person engaged in the business of funeral directing and no licensed funeral director or licensed embalmer shall bill or cause to be billed any item that is referred to as a 'cash advanced' item unless the net amount paid for such item by the funeral firm is the same as is billed by the funeral firm."

[8] General Statutes § 20-227 provides: "The Department of Public Health may refuse to grant a license or inspection certificate or the board may take any of the actions set forth in section 19a-17 against a licensee, registrant or holder of an inspection certificate if it finds the existence of any of the following grounds: (1) The practice of any fraud or deceit in obtaining or attempting to obtain a license, registration or inspection certificate; (2) violation of the statutes or regulations of said department relative to the business of embalming or funeral directing in this state; (3) the conviction of a crime in the course of professional activities; (4) incompetency, negligence or misconduct in the carrying on of such business or profession; (5) violation of or noncompliance with the provisions of this chapter or the rules established hereunder; (6) loaning, borrowing or using a license or inspection certificate of another, or knowingly aiding or abetting in any way the granting of an improper license or inspection certificate; (7) aiding or abetting the practice of embalming or funeral directing by an unlicensed person; (8) physical or mental illness, emotional disorder or loss of motor skill, including but not limited to, deterioration through the aging process; or (9) abuse or excessive use of drugs, including alcohol, narcotics or chemicals. The Commissioner of Public Health may order a license holder to submit to a reasonable physical or mental examination if his physical or mental capacity to practice safely is the subject of an investigation. Said commissioner may petition the superior court for the judicial district of Hartford to enforce such order of any action taken pursuant to section 19a-17. The Department of Public Health shall not refuse to renew any license or inspection certificate nor shall the board suspend any such license, registration or inspection certificate until the holder thereof has been given notice and opportunity for hearing in accordance with the regulations adopted by the Commissioner of Public Health. Any person aggrieved by the action of said department in refusing to renew a license or inspection certificate or by the action of said board in suspending or revoking any license, registration or inspection certificate under the provisions of this chapter or action taken under section 19a-17 may appeal therefrom in accordance with the provisions of section 4-183. No person whose license, registration or inspection certificate is suspended or revoked shall, during such suspension or revocation, enter or engage, either personally or through any corporation, partnership or other organization, or through any agent, in any of the activities which such license, registration or inspection certificate entitled him to engage in; nor shall any such person receive any money or any other valuable consideration on account of engaging in any of such activities. No person

same day, the board issued orders summarily suspending the license and certificate, to be effective pending a final determination regarding the allegations contained in the statement of charges. The board therein scheduled a hearing for November 29, 2005.

On November 23, 2005, the department filed motions to amend the statements of charges to add allegations involving a new out-of-state witness, to which the plaintiffs objected on the ground that they would not be able to subpoena this witness. On November 29, 2005, the day hearings commenced, the board granted the motions to amend with the stipulation that, should the witness involved not return if requested by the plaintiffs, his or her testimony would be stricken from the record. That same day, the department requested permission to file second amended statements of the charges to add a second count concerning Moraski's alleged misconduct with regard to the funeral of another decedent, Judith Jimenez. Over the plaintiffs' objection, the board thereafter granted the request, with the caveat that the new allegations would be heard at a later date to give the plaintiffs an opportunity to prepare a defense.

Broadly characterized, the department alleged in the statements of charges as to both funerals that Moraski had failed to give the decedents' relatives a signed statement of goods and services provided and had engaged in verbally abusive behavior toward the decedents' families when they attempted to resolve the disposition of their loved ones' remains. With respect to Foley specifically, the department alleged, inter alia, that the plaintiffs had: refused to release his remains to another funeral director for burial, failed to cremate his corpse in a timely fashion; stored his unrefrigerated remains

shall pay, promise, offer or give to anyone whose license, registration or inspection certificate is suspended or revoked any money or other valuable consideration for engaging in any of the activities which such license, registration or inspection certificate entitled him to engage in."

outside the embalming room such that the storage constituted a public health risk; and misled and abused his family members when they asked for his corpse or cremains.

The board commenced hearing evidence on the first count pertaining to Foley on November 29, 2005. The board thereafter continued hearing evidence on both counts over the course of several months, specifically, on January 10, January 24, February 27, March 7 and April 11, 2006. In written decisions dated September 12, 2006, the board concluded that the plaintiffs' actions with respect to the handling of the Foley and Jimenez funerals constituted grounds for disciplinary action pursuant to § 20-227 (2), (4) and (5). In a comprehensive twenty page decision, the board set forth each of the department's allegations, cited evidence relevant to each allegation and made findings of fact and conclusions of law relevant to each of the charges. When there was conflicting testimony between Moraski and the department's witnesses, the board consistently found the department's witnesses to be more credible.

Specifically, with respect to the handling of Foley's remains and funeral, the board found that the plaintiffs had not given the family members an itemized price list and the method of payment required for the services actually selected, as required by statute. The board found that, although the plaintiffs were required by statute to have buried or cremated the decedent's remains within a reasonable time after death pursuant to § 7-64, the plaintiffs had not had the decedent's remains cremated, but left them instead unrefrigerated in Colonial's basement for forty-nine days after his death, such that the odor of decomposition was present in the garage of the building. The board credited testimony that the plaintiffs had demanded cash payment and had refused to release Foley's body to Graham, Putnam and Mahoney Funeral Parlors of Massachusetts

(Graham) for burial in that state until such payment was provided. The board further concluded that the plaintiffs had failed to obtain a burial transit removal permit and a death certificate within the five day period prescribed by statute. See General Statutes (Rev. to 2005) § 7-65 and General Statutes § 7-62b (a). It determined that the plaintiffs had failed to comply both with Probate Court orders regarding the filing of the cremation certificate and with the proper preparation of the cremains. The board also credited the testimony of Foley's mother and his former wife, both of whom were involved in the funeral arrangements, that Moraski had yelled at them and called them insulting names, specifically, that Moraski had called Judith Sullivan, Foley's mother, a "scam artist," a "psycho case," a "bitch" a "con-artist" and a "shyster," and had called Lori Foley, the decedent's former wife, a "bitch" and an "asshole."

The board did find, however, that the department had not met its burden of proof with respect to all of its allegations regarding Foley's remains. Most significant was the allegation that the storage of Foley's unrefrigerated remains had constituted a public health risk and hazard, which the board rejected because expert testimony had established that, despite improper storage, the storage of the body in a polyethylene bag eliminated any possibility of direct physical contact between the body and the food or water supply.

With respect to the second count of the statement of charges, pertaining to Jimenez, the board made the following findings. In February, 2005, Jimenez died in Florida. Jimenez' daughter, Carmen Torres, authorized Moraski to transfer her mother's body from Florida to Bradley International Airport in Windsor Locks and met with Moraski to make funeral arrangements. Moraski failed to give Torres either a general price list itemizing the prices of all available goods and services or a written statement itemizing the prices of the services and mer-

chandise that she had selected. Shortly thereafter, Torres retained Washington Memorial Funeral Home (Washington) to handle Jimenez' funeral and authorized it to remove Jimenez' remains from Colonial. John Iacobucci of Washington immediately informed Colonial that Torres had retained Washington and that calling hours would be the following evening. Moraski then contacted Torres, demanded that she meet with him alone and told her that he would not release her mother's remains from Bradley International Airport unless she paid him $350. At some point during these negotiations, Moraski stated to Torres " 'why are you fucking calling me if you don't have the money' " and yelled at Iacobucci to get " 'the fuck off his property' " when Iacobucci came to retrieve Jimenez' body.

On the basis of these previous findings, the board concluded that the plaintiffs had violated §§ 7-62b, 7-64, 7-65, 20-230a and 20-230b, and that license and certificate revocation and a $50,000 civil penalty were warranted under §§ 19a-17 and 20-227. The board concluded that revocation of Moraski's license and Colonial's certificate was appropriate in light of their "blatant disregard for the laws governing [funeral homes] funeral directors and embalmers in Connecticut, the lack of respect [they] demonstrated toward [their] clients and the deceased, and the potential danger [Moraski individually and as Colonial's manager] posed to the general public . . . ." Moreover, because of the egregiousness of Moraski's conduct and the nature of the violations, the board found that a significant civil penalty was fully supported by the record.[9]

---

[9] The board's decisions set forth the following rationale for the penalties assessed: "In this case, the record amply demonstrates [the plaintiffs'] repeated and systematic failure to comply with these statutory requirements. [Their] violations include, but were not limited to: (1) insisting that [they] be paid in cash for [their] services; (2) failing to provide statutorily required price lists; (3) failing to timely obtain a [r]emoval, [t]ransit, and [b]urial permit; (4) failing to timely file a death certificate; (5) failing to timely cremate remains; (6) failing to release remains in a timely manner in an effort

Claiming bias and procedural impropriety, the plaintiffs jointly appealed from the board's decision to the trial court pursuant to General Statutes § 4-183 of the Uniform Administrative Procedure Act (UAPA), challenging both the summary suspension and the permanent revocation and fine.[10] After briefing and oral argument, the trial court dismissed the appeal. The trial court determined that the plaintiffs' claim that the summary suspension was unlawful was moot because the revocation of Moraski's license and Colonial's certificate had superseded the suspension. The court further concluded that the plaintiffs had failed to substantiate the grounds for their appeal of the license and certificate revocations and the fine imposition. This appeal followed.[11]

The plaintiffs raise five claims. They first assert that the trial court improperly dismissed their appeal from

to force [the] decedents' families to pay for [their] services; (7) disobeying a court order; (8) improper storage of human remains; and . . . (9) using abusive language toward family members and employees of other funeral homes. These violations demonstrated a complete disregard and lack of respect for the law, [their] clients, and the general public.

"In addition, throughout the investigation and public hearing into the [c]harges, [the plaintiffs] refused to acknowledge [their] misconduct or to demonstrate any remorse for the violations [they] committed. [Their] conduct was not only contrary to the law, it was also contrary to the accepted norms of [their] profession. Thus, [their] conduct threatened the integrity of the profession and posed a potential danger to the public.

"[The plaintiffs] also demonstrated a lack of respect for the legitimate regulatory functions of the [d]epartment when [they] repeatedly ignored requests by the [d]epartment for information regarding [their] conduct in these matters, including failing to comply with a duly authorized subpoena. The record, therefore, justifies the revocation of [the plaintiffs' license and certificate] as well as the imposition of a significant civil penalty."

[10] Under § 20-230b; see footnote 7 of this opinion; appeals from disciplinary actions by the board are taken under § 4-183 of the UAPA, General Statutes § 4-166 et seq. See part II of this opinion addressing the standard of review under the UAPA.

[11] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the summary suspension of the license and certificate. Next, they claim that the trial court improperly rejected: their challenge to the board's decisions allowing the department to amend the charges against them; their contention that board members were biased; and their claim that certain findings of fact by the board were clearly erroneous. Finally, the plaintiffs contend that the trial court improperly concluded that the board did not abuse its discretion in imposing a substantial fine and revoking Moraski's license and Colonial's certificate. We reject all the plaintiffs' claims. Additional facts will be set forth as necessary.

I

The first issue is whether the trial court properly dismissed the plaintiffs' appeal from the board's summary suspensions of their license and certificate. Because the board thereafter permanently revoked the plaintiffs' license and certificate, the trial court determined that there was no practical relief available to them, and, accordingly, their appeal from the summary suspensions was moot. The plaintiffs claim that, because the board is authorized by statute to suspend summarily a practitioner's license only if it "finds that a practitioner . . . represents a clear and immediate danger to the public health and safety if he is allowed to continue to practice"; General Statutes § 19a-17 (c); due process required a hearing to make such a finding before suspension. Because the board failed to hold a hearing to make such findings, and therefore unlawfully deprived the plaintiffs of their property interest in the continued practice of the profession and business, the plaintiffs contend that the trial court's dismissal was improper. The board responds that revocation of the plaintiffs' license and certificate after an evidentiary hearing superseded the summary suspensions and rendered moot the propriety of the suspensions because no practical relief could follow from a decision

reversing the summary suspensions. We agree with the board.

We readily can resolve the issue of whether the plaintiffs' appeal is moot, beginning with the fundamental principles that underlie justiciability. "Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable." *State* v. *Nardini,* 187 Conn. 109, 111, 445 A.2d 304 (1982). "Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant." (Internal quotation marks omitted.) *Board of Education* v. *Naugatuck,* 257 Conn. 409, 416, 778 A.2d 862 (2001). A case is considered moot if an appellate court cannot grant the appellant "any practical relief through its disposition of the merits . . . ." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission,* 284 Conn. 268, 279, 933 A.2d 256 (2007); see *Seymour* v. *Region One Board of Education,* 261 Conn. 475, 481, 803 A.2d 318 (2002). "Mootness implicates this court's subject matter jurisdiction, raising a question of law over which we exercise plenary review." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission,* supra, 279.

In the present case, when asked directly by the trial court what relief it could afford the plaintiffs given that the summary suspensions were followed by permanent revocation prior to which the plaintiffs did receive a hearing, the plaintiffs simply reasserted their contention that they should have been given a hearing prior to the suspensions. Thus, even had the plaintiffs succeeded in demonstrating that the summary suspensions

were unlawful, there would have been no practical relief that they could have achieved as a result. The suspension was superseded by the revocation; see *In re Michael A.*, 47 Conn. App. 105, 108, 703 A.2d 1146 (1997) ("any issues involving the order of temporary custody are now moot because that order was subsumed by the permanent order"); and no relief could have been afforded from any procedural deficiencies in the former proceedings. See *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 837–38 n.13, 633 A.2d 296 (1993) (expired suspension not moot only because of collateral consequences); *Schallenkamp* v. *DelPonte*, 29 Conn. App. 576, 579, 616 A.2d 1157 (1992) (expired suspension not moot only because it falls within "capable of repetition, yet evading review" exception), aff'd, 229 Conn. 31, 639 A.2d 1018 (1994); *Dragan* v. *Connecticut Medical Examining Board*, 24 Conn. App. 662, 669, 591 A.2d 150 (1991) (challenges to procedures attendant to consent order permitting plaintiff to continue medical practice while license suspension held in abeyance pending resolution of criminal action against plaintiff was rendered moot because period of abeyance ended and medical examining board rendered final judgment revoking license), rev'd on other grounds, 223 Conn. 618, 613 A.2d 739 (1992); see also *Marilyn T., Inc.* v. *Evans*, 803 F.2d 1383, 1384 (5th Cir. 1986) (holding that plaintiff's appeal from denial of preliminary injunctive relief against suspension of commercial lessor's license on ground that procedural due process had not been afforded was rendered moot once license permanently was revoked; noting that plaintiff still could pursue constitutional claim in pending action for damages); *Betts* v. *Dept. of Registration & Education*, 103 Ill. App. 3d 654, 662, 431 N.E.2d 1112 (1981) (concluding that plaintiff pharmacists' contention that summary suspension procedures violated their right to due process was moot because plaintiffs received notice and hearing on

administrative complaint that resulted in license revocation); *Oglesby* v. *Toledo*, 92 Ohio App. 3d 432, 437 n.1, 635 N.E.2d 1319 (1993) (appellants' procedural due process arguments arising from manner in which their massage technician's and establishment operator's licenses were suspended rendered moot by subsequent revocation of licenses because, even "[i]f this court found error in the procedure for suspension, no relief would be available in this procedural context"). Accordingly, we conclude that the trial court properly dismissed the appeal from the summary suspensions as moot.

## II

Next, the plaintiffs assert that the trial court improperly rejected their challenges to the revocation hearing, specifically, that the board had acted improperly: by allowing the department to amend the statement of charges, by acting with bias and by finding facts that were clearly erroneous. We begin with the appropriate standard of review.

As we previously have noted herein; see footnote 10 of this opinion; the plaintiffs' appeal is taken pursuant to the UAPA, General Statutes § 4-166 et seq. "General Statutes § 4-183 (j)[12] of the [UAPA] establishes a

[12] General Statutes § 4-183 (j) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

restricted scope of judicial review of the [board's] final decision and order. . . . [The] plaintiff has the burden of proving that the [board], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . . The law is also well established that if the decision of the [board] is reasonably supported by the evidence it must be sustained." (Citation omitted; internal quotation marks omitted.) *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, 273 Conn. 296, 307–308, 869 A.2d 1198 (2005).

A

The plaintiffs claim that the board acted improperly by allowing the department to amend the statement of charges. Specifically, they contend that allowing the department twice to amend the statement of charges constituted an abuse of discretion because the amendments caused them unfair surprise and denied them the right of cross-examination. We disagree.

The record reflects the following procedural history. With respect to the first amendment, on November 23, 2005, the department filed motions seeking to amend the statement of charges in each case to add allegations involving a new out-of-state witness. The witness was identified as Peter Stefan, a licensed embalmer at Graham, a funeral home in Massachusetts. The board granted that motion with the stipulation that, if the witness involved did not return if requested by the plaintiffs, his testimony would be stricken from the record.

On November 29, 2005, the first day of the hearings, Stefan testified on direct examination that, pursuant to Sullivan's request, he had contacted Moraski to discuss the transfer of Foley's remains to Graham. On January 10, 2006, Stefan returned to court, and the plaintiffs cross-examined him. On the basis of Stefan's testimony, the board found that the plaintiffs had refused to release

Foley's remains to Graham prior to receiving payment for goods and services they had provided for Foley.

With respect to the second amendment, on November 29, 2005, the department presented motions to amend the statements of charges, specifically, to add a second count pertaining to Jimenez' funeral. The department stated that it was "asking to include that [count] in this hearing process but not today because it would obviously be unfair to expect the [plaintiffs] to be able to respond to something that they simply have been presented [with] this morning." The department explained to the board that, because the allegations regarding Jimenez' family had some similarities with respect to the plaintiffs' treatment of Foley's family, the department thought it would be a better use of the board's time to consider the counts together. The plaintiffs responded that bringing this additional matter forward was "fundamentally unfair and prejudicial to [their] case . . . ." The board decided that the new information would not be addressed at that time to allow both the plaintiffs and the board the opportunity to examine it.

Before the hearings proceeded on January 10, 2006, the plaintiffs expressed some confusion as to whether the board had rendered a decision on whether to allow the second amendment. After the board confirmed that it had granted the motions, the chairperson of the board twice offered to wait until January 24 to go forward with the witnesses in connection with the Jimenez matter. The plaintiffs declined to delay the matter, saying, "That's fine. We can proceed." As we previously noted, the hearings thereafter continued on January 24, February 27, March 7, and April 11, 2006.

This court previously has explained in an analogous context that the scope of our review of a decision to allow an amendment is limited. As with our review of

a trial court's decision to allow the amendment of a complaint, "[f]actors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is the [opponent's] burden in this case to demonstrate that the trial court clearly abused its discretion." (Citations omitted; internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 128, 788 A.2d 83 (2002). "If an amendment is allowed at trial and the opponent wants to raise an abuse of discretion issue on appeal, he should immediately move for a continuance in the trial in order to defend against the new issue." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 584, 833 A.2d 908 (2003).

Because the plaintiffs failed to move for a continuance, and indeed declined an offer to delay hearing evidence on certain charges, we reject their unspecified prejudice claim out of hand.[13] Furthermore, in connec-

---

[13] Although the plaintiffs have asserted various specific claims in their brief to this court, such as that some of the witnesses pertaining to the newly added second count did not speak English, they have failed to point to any place in the record showing that they had raised any of these specific claims with the board. Nor have they explained to this court how any of the prejudice that arguably could have resulted from any of these issues would not have been ameliorated sufficiently by a continuance. Additionally, the plaintiffs have cited to criminal law principles and asserted in their brief that the amendment adding the second count pertaining to the Jimenez funeral should be viewed as an improper joinder because the " 'facial similarity between the . . . cases exposed the [plaintiffs] to the potential prejudice that the [board] would decide, cumulatively, that the [plaintiffs were] respon-

tion with their claim regarding their inability to cross-examine Stefan, the plaintiffs did have an opportunity to cross-examine him when he returned to court. Therefore, any claim that the plaintiffs were deprived of this right is without merit.

## B

The plaintiffs also claim that their due process rights were impaired by bias of the board's individual members. Specifically, they claim that, because board members also are directors of funeral parlors in Connecticut, and in some cases in the same geographic region as the plaintiffs, the board members necessarily will gain from eliminating the plaintiffs as competitors. As evidence of the board members' bias, the plaintiffs point to various findings and credibility assessments with which they disagree. Finally, they claim that the board's summary suspension reflects that the board had prejudged the charges against the plaintiffs.

In response, the board contends that the status of some of its members as competitors is not enough to establish actual bias, as is required, and that the evidence cited by the plaintiffs does not reflect such bias. The board further contends that the plaintiffs waived this claim by failing to raise it at the hearing before the board and to ask for the recusal of the allegedly biased board members. Although we are mindful that the trial court overlooked the board's waiver argument and reached this issue on the merits, we agree with the

sible' for all of the acts alleged, and more. *State* v. *Horne*, 215 Conn. 538, 548 [577 A.2d 694] (1990)." The plaintiffs waived this claim before the trial court, however, by responding affirmatively to the following question posed by the court: "Do you acknowledge that . . . there would be no violation of either the UAPA or your constitutional rights if [the department had] given you notice of their intent to amend and an opportunity to prepare a defense to it?" Thus, we read the plaintiffs' claim consistent with its argument to the trial court and reject it on the basis stated in the text of this opinion.

board that the plaintiffs' failure to raise this claim before the board precludes our review.

We begin with certain established principles. "The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification. . . . The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator. . . . Moreover, there is a presumption that administrative board members acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable. . . . The plaintiff has the burden of establishing a disqualifying interest." (Citations omitted; internal quotation marks omitted.) *Clisham* v. *Board of Police Commissioners*, 223 Conn. 354, 361–62, 613 A.2d 254 (1992).

"A claim of bias must be raised in a timely manner. The failure to raise a claim of disqualification with reasonable promptness after learning the ground for such a claim ordinarily constitutes a waiver thereof. *Henderson* v. *[Dept.] of Motor Vehicles*, 202 Conn. 453, 462, 521 A.2d 1040 (1987). One court has noted that a challenge to a judge for bias and prejudice must be made at the first opportunity after discovery of the facts tending to prove disqualification. . . . To hold otherwise would be to allow a litigant to pervert and abuse the right extended to him at the cost to the other party of unnecessary expense and labor and to the public of the unnecessary disruption of the conduct of the courts. . . . *Chafin* v. *United States*, 5 F.2d 592, 595 (4th Cir.), cert. denied, 269 U.S. 552, 46 S. Ct. 18, 70 L. Ed. 407 (1925); see *Duffield* v. *Charleston Area Medical Center, Inc.*, 503 F.2d 512, 515 (4th Cir. 1974) (claim of disqualifying bias or partiality on the part of a member of . . .

an administrative agency must be asserted promptly after knowledge of the alleged disqualification). Moreover, we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the [hearing]. . . . *Henderson* v. [*Dept.*] *of Motor Vehicles*, supra [462]." (Internal quotation marks omitted.) *Clisham* v. *Board of Police Commissioners*, supra, 223 Conn. 367–68.

The importance of raising the issue of bias to the finder of fact is premised not only on interests of judicial economy, but also on the need for an adequate record for review. See *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 21, 756 A.2d 262 (2000), overruled in part on other grounds by *Waterbury* v. *Washington*, 260 Conn. 506, 545, 800 A.2d 1102 (2002); *LaCroix* v. *Board of Education*, 199 Conn. 70, 84–85, 505 A.2d 1233 (1986). "A determination of the existence or absence of actual bias is a finding of fact." *Transportation General, Inc.* v. *Dept. of Ins.*, 236 Conn. 75, 77, 670 A.2d 1302 (1996); *Petrowski* v. *Norwich Free Academy*, 199 Conn. 231, 242, 506 A.2d 139, appeal dismissed, 479 U.S. 802, 107 S. Ct. 42, 93 L. Ed. 2d 5 (1986); *Gaynor-Stafford Industries, Inc.* v. *Water Pollution Control Authority*, 192 Conn. 638, 648, 474 A.2d 752, cert. denied, 469 U.S. 932, 105 S. Ct. 328, 83 L. Ed. 2d 265 (1984). Although there is case law supporting the proposition that it violates due process for administrative agency members to preside over a case in which they are likely to reap a financial benefit by rendering a decision that eliminates a competitor, the financial benefit must be substantial. See *Gibson* v. *Berryhill*, 411 U.S. 564, 578–79, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973) (finding that members of board of optometry who stood to gain from reduced competition resulting from license revocations could not in fairness adjudicate those revocations); *Wilkerson* v. *Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) (concluding that licensing board member's

interest in preventing barber shop from opening next door to his own created "unconstitutional risk of bias"); *Braswell* v. *Haywood Regional Medical Center,* 352 F. Sup. 2d 639, 646 (W.D.N.C. 2005) (denying defendant physicians' motion to dismiss because "[a]s alleged in the amended complaint, [the] [p]laintiff can prove that, given the number of surgical competitors in the community, these physicians stood to gain financially from the suspension of the medical privileges of one of their competitors, and therefore, had a 'substantial pecuniary interest' in the outcome"); see also *Aetna Life Ins. Co.* v. *Lavioe,* 475 U.S. 813, 822, 825, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986) (clarifying that due process is not violated by participation of adjudicators who "might conceivably have had a slight pecuniary interest" in outcome of matter before them, but is violated by participation in decisions in which adjudicators have "direct, personal, substantial, pecuniary interest").

Turning to the case at hand, at no time prior to or during the hearing before the board did the plaintiffs raise the issue of bias.[14] Thus, the plaintiffs did not seek an evidentiary hearing to make a record of facts that might bear on their competitive interest claim, such as the actual location of the board members' businesses in relation to their own, the relative size of the businesses or the number of competitors in addition to board members who might reap some of the plaintiffs' share of business.[15] See *Stivers* v. *Pierce,* 71 F.3d 732,

---

[14] Indeed, in his closing argument to the board, the plaintiffs' counsel stated: "It pleases me that I have such an attentive board, who have obviously been very careful and diligent in their questioning, and have all the evidence before them."

[15] As a result, we are deprived of an adequate record for *Golding* review as well. See *State* v. *Teel,* 42 Conn. App. 500, 506–507, 681 A.2d 974 (concluding that defendant's failure to comply with rules of practice requirement of written motion for recusal with affidavit setting forth facts supporting bias claim deprived court of adequate record for review as required under first prong of *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 [1989]), cert. denied, 239 Conn. 921, 682 A.2d 1012 (1996); see also *State* v. *Marcisz,* 99 Conn. App. 31, 38–39, 913 A.2d 436 (concluding that defendant's unpreserved claim of judicial bias was not of constitutional magnitude and therefore

743 (9th Cir. 1995) (citing similar factors for claim of bias against business competitors on oversight board); *Rite Aid Corp.* v. *Board of Pharmacy,* 421 F. Sup. 1161, 1171 (D.N.J. 1976) (same), appeal dismissed, 430 U.S. 951, 97 S. Ct. 1594, 51 L. Ed. 2d 801 (1977). As one court noted in the context of a similar challenge to a sanction imposed by a state board of funeral directors: "[I]mpermissible bias requires the party asserting the bias to produce evidence particular to the adjudicator and particular to the controversy. . . . The disqualifying bias *cannot simply be inferred from the status of the adjudicator, particularly where the status is required by statute.*"[16] (Citation omitted; emphasis added.) *Pre-Need*

---

defendant was not entitled to *Golding* review), cert. denied, 281 Conn. 922, 918 A.2d 273 (2007); *State* v. *Safford,* 22 Conn. App. 531, 537–38, 578 A.2d 152, cert. denied, 216 Conn. 823, 581 A.2d 1057 (1990) (same).

[16] We note that the legislature has required the board to be comprised of five members: three licensed, practicing embalmers and two members of the public. General Statutes § 20-208 (a). It further has prescribed that "[a] majority of the members of the board shall constitute a quorum." General Statutes § 20-208 (b). Although the scheme governing the board does not provide a procedure for disqualification and substitution of members with direct or indirect financial interests, as it has for numerous other types of boards; see, e.g., General Statutes § 8-11 (zoning boards); General Statutes § 8-21 (planning commission); General Statutes § 22a-42 (c) (wetlands boards or commissions); General Statutes § 22a-354o (a) (aquifer protection commission); see also General Statutes § 31-237f (providing for disqualification of employment security board of review members for "any direct or indirect interest" without specifying financial interest); the plaintiffs have not advanced any argument that the absence of such statutory provisions would preclude board members from voluntarily recusing themselves if a persuasive conflict of interest argument had been advanced timely. Thus, even if we were to assume that a minimum of three board members are required to preside over license suspension and revocation proceedings, the complaint against the plaintiffs could have proceeded even if two of the five board members had to be recused due to a conflict.

Moreover, given the speculative nature of the plaintiffs' claim, we need not reach the thorny issues of whether, in the absence of procedures for alternate board members, the board would have been able to conduct proceedings if there was evidence of actual bias as to a *majority* of its members; see *Federal Home Loan Bank Board* v. *Long Beach Federal Savings & Loan Assn.,* 295 F.2d 403, 408–409 (9th Cir. 1961) (concluding that majority could not disqualify itself on ground of bias); *Marquette Cement Mfg. Co.* v. *Federal Trade Commission,* 147 F.2d 589, 592–94 (7th Cir. 1945) (same); see also *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 524, 368 A.2d 125 (1976)

*Family Services Eastern Region* v. *Bureau of Profes-
sional & Occupational Affairs*, 904 A.2d 996, 1003–1004
(Pa. Commw. 2006), cert. denied, 591 Pa. 707, 918 A.2d
749 (2007); accord *Kachian* v. *Optometry Examining
Board*, 44 Wis. 2d 1, 11, 170 N.W.2d 743 (1969) ("it
appears to be a general rule that membership in or
connection with the same profession or occupation as
that of the accused licensee does not alone indicate a
disqualifying bias or interest on the part of the ques-
tioned tribunal member sufficient to violate due pro-
cess" [internal quotation marks omitted]). Thus, the
plaintiffs in the present case have failed to undertake
the steps necessary to have this court review their
bias claim.

C

Finally, the plaintiffs claim that the board's determi-
nations of fact were clearly erroneous "in view of the
reliable, probative and substantial evidence on the
whole record, or arbitrary or capricious, or character-
ized by abuse of discretion or a clearly unwarranted
exercise of discretion." "In determining whether an
administrative finding is supported by substantial evi-
dence, the reviewing court must defer to the agency's
assessment of the credibility of witnesses. . . . The

(applying rule of necessity); and whether presumptively disqualifying facts
as to a majority of the board would implicate the principle that a party need
not pursue a course of action that would be futile. See *Rizzo Pool Co.* v.
*Del Grosso*, 240 Conn. 58, 63, 689 A.2d 1097 (1997) ("[w]e do not generally
require parties to engage in futile conduct"); see, e.g., *State* v. *Ledbetter*, 275
Conn. 534, 558–59, 881 A.2d 290 (2005) (defendant did not waive objection
because trial court's lack of authority to overrule precedent at issue would
have rendered objection futile), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798,
164 L. Ed. 2d 537 (2006); *State* v. *Velky*, 263 Conn. 602, 614–15, 821 A.2d
752 (2003) (defendant did not waive objection because trial court's previous
comments indicated that objection would have been futile); *Gaynor* v.
*Payne*, 261 Conn. 585, 599, 804 A.2d 170 (2002) (res judicata did not bar
plaintiff's claim because lack of jurisdiction of Probate Court and Superior
Court in administrative appeal to consider claim would have made it futile
to raise it).

reviewing court must take into account contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Citations omitted; internal quotation marks omitted.) *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 668, 638 A.2d 6 (1994). Upon our thorough review of the record, guided by the board's comprehensive recitation of the evidence supporting each of the findings of fact and by its well founded determination of numerous statutory violations, we are convinced that the trial court correctly determined that the board acted properly. See *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, supra, 273 Conn. 308 ("[a]n administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred" [internal quotation marks omitted]).

## III

In their final claim, the plaintiffs assert that the trial court improperly rejected their contention that the board abused its discretion in imposing the penalties in this case, namely, revoking their licenses and assessing a $50,000 fine. Harkening back to their other claims of bias and prejudice, they claim that "[t]he intent of this punishment is to ruin, rather than correct." The plaintiffs' claim lacks merit in light of the record.

Under the well established standard of review, "[i]f the penalty meted out is within the limits prescribed by law, the matter lies within the exercise of the [board's] discretion and cannot be successfully challenged unless the discretion has been abused. . . . Sentencing is an inherently fact bound inquiry. In an administrative appeal, a reviewing court can do no more, on the factual questions presented, than to examine the record to

determine whether the ultimate findings were supported, as the statute requires, by substantial evidence." (Citation omitted; internal quotation marks omitted.) *Pet v. Dept. of Health Services*, supra, 228 Conn. 677–78.

The board is authorized under § 20-227; see footnote 8 of this opinion; to take any disciplinary action set forth in General Statutes (Rev. to 2005) § 19a-17[17] if a

---

[17] General Statutes (Rev. to 2005) § 19a-17 provides: "(a) Each board or commission established under chapters 369 to 376, inclusive, 378 to 381, inclusive, and 383 to 388, inclusive, and the Department of Public Health with respect to professions under its jurisdiction which have no board or commission may take any of the following actions, singly or in combination, based on conduct which occurred prior or subsequent to the issuance of a permit or a license upon finding the existence of good cause:

"(1) Revoke a practitioner's license or permit;

"(2) Suspend a practitioner's license or permit;

"(3) Censure a practitioner or permittee;

"(4) Issue a letter of reprimand to a practitioner or permittee;

"(5) Place a practitioner or permittee on probationary status and require the practitioner or permittee to:

"(A) Report regularly to such board, commission or department upon the matters which are the basis of probation;

"(B) Limit practice to those areas prescribed by such board, commission or department;

"(C) Continue or renew professional education until a satisfactory degree of skill has been attained in those areas which are the basis for the probation;

"(6) Assess a civil penalty of up to ten thousand dollars; or

"(7) Summarily take any action specified in this subsection against a practitioner's license or permit upon receipt of proof that such practitioner has been:

"(A) Found guilty or convicted as a result of an act which constitutes a felony under (i) the laws of this state, (ii) federal law or (iii) the laws of another jurisdiction and which, if committed within this state, would have constituted a felony under the laws of this state; or

"(B) Subject to disciplinary action similar to that specified in this subsection by a duly authorized professional agency of any state, the District of Columbia, a United States possession or territory or a foreign jurisdiction. The applicable board or commission, or the department shall promptly notify the practitioner or permittee that his license or permit has been summarily acted upon pursuant to this subsection and shall institute formal proceedings for revocation within ninety days after such notification.

"(b) Such board or commission or the department may withdraw the probation if it finds that the circumstances which required action have been remedied.

license holder acts negligently, incompetently or wrong-fully in the conduct of his profession. Our task is not to second-guess the agency's choice of sanction. We look to whether evidence existed that gave the agency the discretion to impose the penalty of revocation and we will not restrict the deference we are statutorily bound to give administrative decisions in the absence of statutory authority. We previously concluded that the board acted within the scope of its discretion in finding the facts it relied upon to impose the fine and to revoke the license and certificate.

Mindful of the board's purpose of protecting the public's interest in proper funeral, burial and embalming services, we cannot conclude that the board exceeded its authority or abused its discretion in revoking the plaintiffs' license and certificate. In the analogous context of reviewing a board of education's exercise of

"(c) Such board or commission or the department where appropriate may summarily suspend a practitioner's license or permit in advance of a final adjudication or during the appeals process if such board or commission or the department finds that a practitioner or permittee represents a clear and immediate danger to the public health and safety if he is allowed to continue to practice.

"(d) Such board or commission or the department may reinstate a license which has been suspended or revoked if, after a hearing, such board or commission or the department is satisfied that the practitioner or permittee is able to practice with reasonable skill and safety to patients, customers or the public in general. As a condition of reinstatement, the board or commission or the department may impose disciplinary or corrective measures authorized under this section.

"(e) As used in this section, the term 'license' shall be deemed to include the following authorizations relative to the practice of any profession listed in subsection (a) of this section: (1) Licensure by the Department of Public Health; (2) certification by the Department of Public Health; and (3) certification by a national certification body.

"(f) As used in this chapter, the term 'permit' includes any authorization issued by the department to allow the practice, limited or otherwise, of a profession which would otherwise require a license; and the term 'permittee' means any person who practices pursuant to a permit."

Subsection (a) (6) of this section has been amended by Public Acts 2007, No. 07-252, § 5, to increase the civil penalty from $10,000 to $25,000.

discretion in terminating a teacher's contract following one incident of misconduct, we affirmed that board's decision, noting that "[w]hether termination is justifiable on the basis of a single incident is a qualitative not quantitative analysis; one serious incident can suffice." *Rogers* v. *Board of Education*, 252 Conn. 753, 771, 749 A.2d 1173 (2000). In the present case, the board found that the plaintiffs' "repeated and systematic failure to comply with . . . statutory requirements . . . demonstrated a complete disregard and lack of respect for the law, [their] clients, and the general public." The facts clearly support this assessment. The board's decision as to which penalty to assess does not appear to rest on any one particular finding, but on the cumulative effect of all of the board's findings. See footnote 9 of this opinion. The board was free to find, on the evidence presented, that the plaintiffs' conduct betrayed the trust that is reposed in them as a licensed embalmer or funeral home operator and compromised the integrity of their profession. The legislature vested in the board the power to evaluate the competency of embalmers and funeral directors in this state and to adjudicate complaints and impose proper sanctions when warranted. The board found that the plaintiffs' conduct deviated from the standard of care to such an extent that it warranted the revocation of Moraski's license and Colonial's certificate. Under these circumstances, we cannot conclude as a matter of law that the board's action was arbitrary and capricious or an abuse of discretion.

With regard to the claim that the fine against Moraski was excessive, we again conclude that the board acted within the scope of its discretion. At the time of the violations at issue, § 19a-17 (a) (6) permitted a fine of $10,000 per violation. See footnote 17 of this opinion. The board found that the department had sustained its burden of proof as to nearly all of the fifty-two para-

graph complaint as to each plaintiff that alleged more that a dozen allegations. See footnote 9 of this opinion. As we previously concluded, there is substantial evidence in the record to support the board's decisions. The trial court therefore properly dismissed the plaintiffs' appeal.

The judgment is affirmed.

In this opinion the other justices concurred.